IN THE DISTRICT COURT OF GRADY COUNTY
STATE OF OKLAHOMA

STEVEN BARNETT and
MARSHA BARNETT,

Plaintiffs,

v.

TODD ROWLAND INSURANCE AGENCY,
STEVE BREED CONSTRUCTION CO., and
STATE FARM FIRE AND CASUALTY
COMPANY,

Defendants.

Case No. CJ-2020-141

FILED IN DISTRICT COURT
Grady County, Oklahoma
APR - 8 2024
LISA HANNAH, Court Clerk
By [signature] Deputy

**PLAINTIFFS' MOTION TO ENFORCE DISCOVERY ORDER OF NOVEMBER 23, 2021 AND MOTION FOR SANCTIONS**

Two and a half years ago, the Court compelled personal and program rules State Farm uses in damages estimating software to control adjuster behavior and ultimately improperly lower indemnity payments to insureds. After one granted motion to compel, a granted motion to enforce, a denied motion to reconsider or clarify, a denied motion for certification of compliance, two deferred requests for sanctions, six Court-ordered depositions, and numerous supplemental discovery responses, ***Plaintiffs still do not have these rules***. Instead, State Farm has consistently represented that there are no such rules, or if there are, there is no list or other way to identify the rules in effect—thus, there is nothing to produce. But Thomas Moss, the most recent State Farm records custodian deposed, exposed these claims as flagrant misrepresentations. There is no excuse for State Farm's non-compliance and falsehoods. The time for sanctions has come.

**FACTUAL BACKGROUND**

1. Plaintiffs filed their Motion to Compel on October 18, 2021. This Motion sought to compel from State Farm full and complete discovery responses, in relevant part, to Request for Production ("RFP") 36, which read: "Produce copies of any and all Personal Rules, Program Rules

EXHIBIT
3

and Personal Program Rules, which State Farm has had in place pertaining to or affecting Xactimate estimates from 2010 to present." State Farm filed its response on November 2, 2021.

2. The Court heard oral argument on November 23, 2021, sustaining Plaintiffs' Motion in full and ordering State Farm comply within six months—by May 23, 2022. *See* Ex. 1 (Court Minute Regarding Plaintiffs' Motion to Compel) (the "Discovery Order").

3. Approximately five months later—one month before State Farm's compliance deadline was set to lapse—defense counsel admitted ***thousands*** of emails exist notifying application users when these rules are triggered. *See* Ex. 2 at 3 (Apr. 14, 2022 Email from L. Leffel) ("[T]he review has identified 160,000 or more emails where a personal rule was triggered."); *id.* at 2 (May 3, 2022 Email from L. Leffel) ("[T]here are closer to 600,000 emails."). Logically, there cannot be 600,000 emails "where a personal rule was triggered" if the underlying rules do not exist. Nonetheless, defense counsel claimed, "State Farm does not maintain a list of 'personal rules,' [and] [t]here are no company or enterprise wide personal rules." *Id.* at 2 (May 3, 2022 Email from L. Leffel). State Farm served a supplemental response to RFP 36 the following day stating the same. *See* Ex. 3 (Excerpt of State Farm's May 23, 2022 Supp. Disc. Rsp.).

4. May 23rd passed without State Farm's compliance. Thus, on June 30, 2022, Plaintiffs filed their first Motion to Enforce the Court's Discovery Order and Motion for Sanctions (the "First MTE"). State Farm responded on July 19, 2022, and Plaintiffs replied on July 29th.

5. The Court heard oral argument on the First MTE on August 2, 2022. There, the Court specifically stated: "I think the plaintiff has certainly demonstrated today that ***there are Personnel Rules … that are discoverable, that are in existence, that have not been turned over***." Ex. 4 (Aug. 2, 2022 Hrg. Tr.) at 92:15–19 (emphasis added). Continuing, "I know that I have seen in this case evidence of inconsistent discovery results that in one case, in this case, there has been

denials that things exist, that appear in other cases. That is – that is odious to my sense of justice." *Id.* at 108:25–109:4. While the Court reserved ruling on sanctions, it did order production of a "drop-down" index from State Farm's intranet ("SFNet") to use as a rubric for compliance within thirty days and designation of records custodians to speak to State Farm's due diligence methods when responding to discovery requests within 45 days. *See id.* at 109:12–22 (the "August 2nd Order"). Notably, this drop-down index revealed State Farm maintains a specific tab titled "Personal Rules." *See* Ex. 5 (SFNet Menu).

6. While the Court was very clear when issuing its ruling on the First MTE, State Farm nevertheless filed its Motion for Reconsideration or Clarification of the Court's August 2nd Order on September 15, 2022. By agreement, the parties presented oral argument after a previously-set hearing on September 19, 2022. Ex. 6 (Sept. 19, 2022 Hrg. Tr.) at 3:23–4:1. At that time, Plaintiffs informed the Court, "[a]t the end of the 45 days, the only person they've identified as being knowledgeable in discovery is the same guy that had signed the verification back before our [August 2nd] hearing," Brian Ingersoll. *Id.* at 65:5–8. Clarifying the August 2nd Order, the Court stated: "I expect State Farm to produce a witness with comprehensive relevant knowledge that will be meaningful in a deposition situation." *Id.* at 71:7–9. Meaning, "[i]f one person has actually familiarized themselves with the process of those 22 different workers [involved in responding to discovery] … then that's great," however, "[i]f that witness says well, I don't know, I'd have to ask this person, … then it doesn't comply with my ruling." *Id.* at 71:10–18. Thus, the Court permitted State Farm to offer Brian Ingersoll, but reserved ruling on whether that sole witness would be compliant. *See id.* at 72:10–13. Otherwise, the Court confirmed, "that was my [August 2nd] ruling. And I'm gonna stand behind – behind it. And it's been clear, so now I'm gonna hold you to it." *Id.* at 77:15–17.

7. The parties began working to schedule Mr. Ingersoll's Court-ordered deposition. As part of those communications, State Farm offered four topics to guide the deposition—even though the Court already clearly opined on the scope of the testimony. Plaintiffs rejected State Farm's topics, as they retroactively limited the Court's order. Consequently, on November 9, 2022, State Farm filed a Motion for Protective Order to Conform Scope of Ingersoll Testimony to Order and Confirm Acceptability of State Farm's Productions. Plaintiffs responded on November 18th.

8. The Court heard oral argument on November 21, 2022. There, Plaintiffs' counsel informed the Court that: (1) State Farm produced the drop-down index in an unusable format, which did not conform to the Court's August 2nd Order; (2) the produced index did not include the "Personal Rules" tab that clearly appears on SFNet; and (3) State Farm still had yet to produce the Court-ordered Xactware rules. *See* Ex. 7 (Nov. 21, 2022 Hrg. Tr.) at 20:15–21:20, 30:23–25, 32:17–33:9, 38:15–19. Consistent with its August 2nd Order, the Court ordered reproduction of the drop-down index "in a clickable way," unless certain documents or tabs are "not currently linked to the website" (*i.e.*, SFNet), in which case the subfoldered HTML files would be sufficient.[1] *Id.* at 40:9–15. Regarding the scope of Mr. Ingersoll's deposition, the Court stood by its August 2nd order: "I'm not limiting anything that I ruled in my previous order." *Id.* at 28:9–10.

9. Plaintiffs conducted Mr. Ingersoll's deposition on November 22, 2022. Predictably, Mr. Ingersoll was unable to competently testify to State Farm's discovery processes and due diligence methods. He did, however, confirm State Farm had yet to make the Court-ordered supplemental production—including production of State Farm's Xactware rules under RFP 36. These failures formed the basis for Plaintiffs' Renewed Motion for Sanctions, filed December 28, 2022. State Farm responded on January 9, 2023, and Plaintiffs replied on March 9, 2023.

[1] To this day, State Farm has failed to produce a workable rendition of SFNet with clickable links that contains all of the Court-ordered tabs and information.

10. The Court heard oral argument on March 16, 2023. After considering Mr. Ingersoll's deficient testimony, the Court expressly allowed five corporate representative depositions, to be selected by Plaintiffs' counsel, pursuant to the August 2nd Order. *See* Ex. 8 (Mar. 16, 2023 Hrg. Tr.) at 11:24–13:2. Plaintiffs' counsel was to select five representatives from the list of thirty-five persons who "[s]upplied … information upon which [State Farm's] Answers [were] based," according to State Farm's Second Supplemental Responses. Ex. 9 (Excerpt of State Farm's Nov. 18, 2022 Supp. Disc. Rsp.). Plaintiffs selected Thomas Moss as one of the corporate representatives; he was the final deposition Plaintiffs took pursuant to the August 2nd Order. *See* Ex. 10 (July 21, 2023 Email from L. Leffel).

11. Importantly, the day before the March 16th hearing, State Farm served supplemental responses to some of Plaintiffs' requests for production. In response to RFP 36, State Farm stated, "there are no such documents in State Farm's custody or control. State Farm does not maintain a list of 'personal rules.' There are no company or enterprise wide personal rules. … [But] State Farm will produce reports of all personal rules that were triggered from January 1, 2010 – December 31, 2022." *See* Ex. 11 (Excerpt of State Farm's Mar. 15, 2023 Supp. RFP Rsp.). State Farm produced the purportedly responsive reports on May 31, 2023. *See* Ex. 12 (Excerpt of State Farm's May 31, 2023 Supp. Disc. Rsp.). Tellingly, this response and production wholly ignored Plaintiffs' Court-ordered request for "Program Rules."

12. After the above protracted motion practice, Plaintiffs were finally able to depose Mr. Moss on August 17, 2023—over a year after this Court ordered records custodian depositions. As discussed below, Mr. Moss testified at length about personal rules and program rules. Despite this testimony, State Farm has yet to supplement its response and production to RFP 36. To date, production is limited to emails and reports further evincing the rules' existence.

## ARGUMENTS AND AUTHORITES

Evidence of the rules' existence does not begin and end with notification emails or reports. Mr. Moss, State Farm's corporate representative, explained where these rules are maintained, how they work, how they are established, and how they are triggered—including State Farm's development of certain rules with the software provider, Xactware, directly. Against this background, State Farm's claims that "there are no such documents in State Farm's custody or control" and "[t]here are no company or enterprise wide personal rules" ring hollow. Ex. 11. The juxtaposition between State Farm's discovery responses and Mr. Moss's testimony is illustrative of State Farm's overarching resistance to institutional discovery. But resistance and obstructive discovery tactics cannot stand in the face of unsatisfied Court orders. Considering State Farm had ***two and a half years*** to comply with the Discovery Order, sanctions are more than warranted.

### A. The Court Has Discretion to Sanction State Farm for Discovery Misconduct.

Title 12, section 3237 grants the Court wide discretion to sanction a party for failing to either participate in discovery or comply with a discovery order, especially where the party's failure "is occasioned by fault, willfulness, or bad faith." *Payne v. Dewitt*, 1999 OK 93, ¶ 9, 995 P.2d 1088, 1093; *see also Barnett v. Simmons*, 2008 OK 100, ¶ 17, 197 P.3d 12, 19 ("willfulness of a party's conduct is relevant to the severity of the sanction to be imposed, not whether a sanction should be imposed"); *id.* at ¶ 24 ("If a party has failed to obey an order of the court[,] the court may enter orders that are just."); *see also Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1320 (10th Cir. 2011)[2] (holding, under the federal rules, "district courts enjoy very broad discretion to use sanctions where necessary to insure … that lawyers and parties … fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial").

[2] The Court may consider federal opinions when interpreting the Oklahoma Discovery Code. *West v. Cajun Wharf, Inc.*, 1988 OK 92, ¶ 13, 770 P.2d 558, 562.

In addition to the Court's authority to sanction a party under 12 O.S. § 3237, "[a] trial court has inherent authority to impose sanctions … for abusive litigation practices or for abuse of judicial process, even if an order compelling discovery has not been made." *Hicks v. Cent. Oklahoma United Methodist Ret. Facility, Inc.*, 2017 OK CIV APP 23, ¶ 22, 423 P.3d 684, 696. State Farm's ongoing refusal to comply with the Discovery Order is nothing short of bad faith litigation conduct and is inherently prejudicial to Plaintiffs. *See Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 241–242 (3rd Cir. 2007) (defendant's belated document production prejudiced plaintiff's ability to develop its case, including determining who to depose and how to proceed without the withheld documents); *M & G Polymers USA, LLC v. Carestream Health, Inc.*, 2010 WL 1611042, at *65 (Del. Super. Ct. Apr. 21, 2010) (belated production deprived plaintiff the opportunity to conduct depositions with full knowledge of the facts). As the Oklahoma Supreme Court made clear:

> The intent of the Oklahoma discovery statutes is to attempt to provide procedures which promote accurate information in advance of trial concerning the actual facts and circumstances of a controversy, ***rather than to aid in its concealment***. … Pretrial discovery procedures are intended to ***enhance truth-seeking process***, and ***good faith compliance with such procedures is both desirable and necessary***.

*Boswell v. Schultz*, 2007 OK 94, ¶ 14, 175 P.3d 390, 395 (internal citations omitted, emphasis added). This Court echoed that sentiment during the August 2, 2022 hearing:

> If I required Mr. Marr to sit down in advance and say here's how we know you haven't given us everything you have, that would only guarantee Mr. Marr got what he already had. ***That wouldn't be discovery that would be confirmation. Discovery, the purpose of discovery is to elicit information that is likely to lead to admissible evidence.*** You don't ever get more by saying, I know, I already have this, you give it to me also. … And it's my job as a judge to make sure that we have a discovery system with some kind of teeth, some way to ensure justice.

Ex. 4 at 94:5–13, 109:5–7. State Farm's continued obfuscation calls for teeth: sanctions to ensure compliance moving forward.

### B. State Farm's Corporate Testimony Confirms the Rules Can Be Produced.

Tom Moss—a high-ranking State Farm Claims Consultant, charged in part with managing the relationship between State Farm and Xactware, the company behind Xactimate and XactAnalysis (Ex. 13, T. Moss Depo., at 76:6–78:14)—confirmed the existence of the Court-ordered rules and explained their purpose and application.

For context, "the [software] tool that State Farm uses to complete building estimates [*i.e.*, damage estimates] is Xactimate." *See id.* at 76:9–11. XactAnalysis, however, is a communication and reporting tool. *Id.* at 123:23–25 ("XactAnalysis is a reporting tool that Xactware created that pulls in information from Xactimate."). Estimates that are completed in Xactimate are automatically uploaded to XactAnalysis. *Id.* Within XactAnalysis, management-level users can set up "personal rules," which send an email notification to specified recipients when certain conditions are met or "triggered." *Id.* at 125:2–25, 128:13–24, 130:17–131:12. As an example, State Farm implemented a policy that claims adjusters could not issue a full roof replacement without managerial approval. *See, e.g.*, Ex. 14 (Excerpt from K. Wienstroer Depo., *Hosier v. State Farm, et al.*, CJ-2021-1741 (Dist. Ct. Okla. Cnty. Apr. 26, 2023)) at 70:12–22.[3] A team manager could go into XactAnalysis and establish a personal rule notifying them any time an adjuster completed an estimate for a full roof replacement, thereby prompting managerial involvement. Thus, management-level employees can access and see which personal rules effect their team. State Farm simply did not take that step—instead representing there is no overarching list of personal rules, and no personal rules were "triggered" on the Barnett claim. *See* Ex. 11. But if these rules have the intended effect, individual adjusters will trigger them less over time. Their existence alone speaks to State Farm's attempts to coerce adjusters into improperly lowering indemnity.

[3] Tellingly, no managerial approval was required for an adjuster to completely deny a claim. *Id.*

Program rules, on the other hand, are not controlled by the user, but operate as part of the software itself. *See* Ex. 13 at 76:15–19, 78:19–79:15, 128:25–129:23 (describing the program rules as "settings within Xactimate" that are selected in State Farm's company-wide "user profile" and "allow [State Farm] to complete estimates that align with … our Operation Guides"). The program rules—*i.e.*, State Farm's selected user profile settings—dictate the level of detail an adjuster can provide when preparing a damage estimate and influence adjusters' use of the estimating tool. To illustrate, Xactimate offers various categories of building elements (*i.e.*, "drywall, roofing, flooring," etc.), each containing additional "selector codes" and line items (*i.e.*, for the roofing category, "various types of composition shingles, … roof vents," turtle flashing, drip edge, etc.) that correspond to a price-per-unit amount, ultimately providing a cost break down for repairs or replacement of said building element(s). *Id.* at 31:20–35:2. Which categories and selector codes State Farm decided to make available to its adjusters are contained within the program rules. Likewise, State Farm worked with Xactware to develop and add program rules that prompt all State Farm adjusters to reevaluate and revise their estimates when certain conditions are met. *Id.* at 118:8–119:8, 126:1–127:2 (describing some rules as real-time prompts that would appear when an adjuster added or failed to add various line items, *i.e.*, "Hey, you're including this other thing in the estimate and do you need to include it because it's already part of another line item?"); *id.* at 131:19–132:14 ("[T]here was a rule that [Xactimate] did not have available that we felt would benefit … our estimate writers [that] were writing wind and hail roof claim estimates; so we went to Xactware and asked if they would consider adding that rule."). Although "[t]hose rules apply to every estimate that's written by State Farm" (*id.* at 128:10–11), "an individual estimate writer doesn't know all the rules that are out there" (*id.* at 129:9–11). Rather, those rules would be in State Farm's Xactware user profile selections—which are certainly within State Farm's custody.

Long before taking the deposition of Mr. Moss, Plaintiffs' counsel suspected exactly this: that State Farm uses these covert rules to control adjuster behavior in an effort to improperly lower indemnity payments to insureds. Counsel explained this very manipulation at the August 2, 2022 hearing on Plaintiffs' First MTE:

> What we have suspected before, and what we have since learned is … [t]hat in order to ensure that these claim handlers limit the damage, they have rules, rules within the software. And these rules are hidden. Policyholder never sees them. Most lawyers never see them. In fact, most people never figure it out. And I would equate those rules to something like, when you have kids and you take them to the bowling alley. And you want to make sure that their balls don't end up in the gutter, you want to make sure that they hit the mark and hit the pin. So what do you do? You flip the … bumpers down. And that makes sure that when the ball leaves their hand it makes it all the way to the desired target and that's the pins. That's what the rule[s] are.
>
> …
>
> The rules. We talked about the rules. The hidden rules that control the adjuster and the supervisors and everybody else's behavior so as to ensure that those goals, those targets, those business objectives that come down from corporate every year are satisfied.

Ex. 4 at 9:21–10:13, 31:16–20. The primary "business objective" here is State Farm's campaign to improperly lower indemnity payments to insureds on roof claims. This campaign is far from some figment of imagination—it's a well-documented goal of State Farm.

> P&C Claims is focusing on what we can do to lower our indemnity payments related to Roofs. Last year we had an indemnity over $3.5 Billion dollars and a total of $16.6 Billion over the last 7 years for the Enterprise on roofing. Xactware has enhanced their Aerial Sketch tool to help our Claim partners in writing estimates for roofs. Listed below are some facts in supporting the 27.5 Service Pack.

CCCN00035094PROD (produced, unprotected, in *Misner v. State Farm*, CJ-2013-1050 (Dist. Ct. Cleveland Cnty.)). Indeed, Mr. Moss further confirmed that indemnity payments on wind/hail roof claims are State Farm's largest spend. Ex. 13 at 52:2–53:4 ("[A]s our most frequent claim,

indemnification associated with roof claims and wind and hail claims is typically our highest category type, or peril, for indemnification."). Thus, the personal and program rules effectuate State Farm's goal of lowering indemnity payments by manipulating adjuster behavior.

State Farm's failure to produce these rules in accordance with the Discovery Order and August 2nd Order—and its contrived falsities regarding the very existence of such rules on an enterprise-wide basis—are just more examples of the same bad faith treatment State Farm provides its insureds. There is no excuse for withholding the rules. The Discovery Order plainly compels production of all "Personal Rules, Program Rules and Personal Program Rules … ***pertaining to or affecting*** Xactimate estimates from 2010 to present." *See supra*, ¶ 1 (emphasis added). The Court enforced this ruling in the August 2nd Order nearly two years ago. *See supra*, ¶ 5. The time for compliance has long passed. Evidently enforcement alone is insufficient against State Farm.

**C. Sanctions Are Necessary.**

Clearly, the Court-ordered documents exist, despite State Farm's inexplicable denial or deflection, arguing that because there is not a single list of all personal rules, the rules cannot be produced. *See supra*, ¶¶ 3 & 11. "[I]t's a general rule of evidence that you never get to lie." Ex. 4 at 110:11–12. State Farm's penchant for half-truths must be curbed. Plaintiffs respectfully request sanctions against State Farm as follows:

(1) Production in accordance with the Discovery Order and August 2nd Order, as they pertain to RFP 36, within thirty (30) days and assessing a monetary fine for each day State Farm fails to meet that deadline;

(2) Verification of any supplemental or new responses to Requests for Production where "no responsive documents" exist or documents are not in State Farm's "custody or control," including a full explanation of how or why State Farm does not have "custody or control" of said documents;

(3) Modification of the Protective Order, such that State Farm cannot make similar misrepresentations before other courts (which the Court stated would be the next step if State Farm's noncompliance continued, *see id.* at 110:1–17); and

(4) Costs and fees associated with this filing, any reply, and any hearing thereon.

**CONCLUSION**

Plaintiffs respectfully request an order from this Court granting Plaintiffs' Motion to Enforce Discovery Order of November 23, 2021 and Motion for Sanctions, as outlined above.

Respectfully submitted,

Ashton Poarch, OBA No. 34308
Nick Marr, OBA No. 34284
**NIX PATTERSON, LLP**
512 N. Broadway Ave., Ste. 200
Oklahoma City, OK 73102
Telephone: (405) 516-7800
Facsimile: (405) 516-7859
*nmarr@nixlaw.com*
*apoarch@nixlaw.com*

*-and-*

Chad Ihrig, OBA No. 19491
**NIX PATTERSON, LLP**
8701 Bee Cave Rd.
Building 1 (East), Ste. 500
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
*cihrig@nixlaw.com*

*-and-*

Jeff D. Marr, OBA No. 16080
Carole Dulisse, OBA No. 18047
**MARR LAW FIRM**
4301 Southwest Third St., Ste. 110

Oklahoma City, OK 73108
Telephone: (405) 236-8000
Facsimile: (405) 236-8025
*jeffdmarr@marrlawfirm.com*
*cdulisse@marrlawfirm.com*

*-and-*

Jo L. Slama, OBA No. 13426
**SLAMA LEGAL GROUP**
4301 Southwest Third Street
Oklahoma City, OK 73108
Telephone: (405) 609-1600
Facsimile: (405) 609-1601
*jo@slamalegal.com*

*-and-*

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
**WHITTEN BURRAGE**
512 N. Broadway Ave., Ste. 300
Oklahoma City, OK 73102
Telephone: (405) 516-7800
Facsimile: (405) 516-7859
*rwhitten@whittenburragelaw.com*
*mburrage@whittenburragelaw.com*

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2024, a true and correct copy of the foregoing document was delivered, via first class mail and/or electronic mail, to the following interested parties:

Lance E. Leffel
Talitha E. Ebrite
Ashlyn M. Smith
Brain D. Blackstock
**GABLE GOTWALS**
BOK Park Plaza
499 West Sheridan Ave., Ste. 2200
Oklahoma City, OK 73102

Grant A. Fitz
**GABLE GOTWALS**
100 N. Elgin Ave., Suite 200
Tulsa, OK 74120

Kevin M. Walos
Roger K. Gofton
**WILSON CAIN & ACQUAVIVA**
300 NW 13th Street, Suite 100
Oklahoma City, OK 73103

Jeromy E. Brown
Jessica Swapp
Ty J. Gilmore
**MCCALLA BROWN PATEL LLP**
126 W. Chickasha Ave.
Chickasha, OK 73018

Ashton Roach

**ATTORNEY FOR PLAINTIFFS**

# EXHIBIT 1

FILED IN DISTRICT COURT
Grady County, Oklahoma

NOV 23 2021

LISA HANNAH, Court Clerk
By Deputy

IN THE DISTRICT COURT OF GRADY COUNTY
STATE OF OKLAHOMA

Barnett,
Plaintiff(s)

vs. : CJ- 20-141

State Farm Fire and Casualty, et al
Defendant(s)

Plaintiff Lawyer
Attorney(s) for Plaintiff(s)

Defendant Lawyer
Attorney(s) for Defendant(s)

Court Reporter

☐ FINAL ORDER ☐ ORDER TO BE PREPARED BY

Date: November 23, 2021

PLAINTIFF'S MOTION: To Compel

(✓) SUSTAINED ( ) OVERRULED ( ) STRICKEN

HEARING ON MOTION CONTINUED TO:

Must comply w/6 Months

DEFENDANT'S MOTION:

( ) SUSTAINED ( ) OVERRULED ( ) STRICKEN

HEARING ON MOTION CONTINUED TO:

OTHER COMMENTS:

DISTRICT JUDGE

**EXHIBIT 1**

# EXHIBIT 2

**From:** Lance Leffel
**To:** Carole Dulisse
**Cc:** E. Talitha Ebrite; Ashlyn Smith; Trisha Parent; Jeff Marr
**Subject:** RE: Barnett Production
**Date:** Tuesday, May 3, 2022 4:43:08 PM
**Attachments:** image005.png
image006.png
image001.png
image002.png
image003.png

---

Thanks, I missed the order. I will follow up with State Farm on the personal rules issue.

**Lance Leffel** (He/Him/His) | Shareholder | **GableGotwals**
(w) 405-235-5582 | (f) 405-235-2875 | lleffel@gablelaw.com
BOK Park Plaza | 499 W. Sheridan Avenue, Suite 2200
Oklahoma City, OK 73102 | USA | Bio | Download vcard | www.gablelaw.com |

This message and any attachments are for the addressee only and may contain privileged or confidential information. If you have received this in error, please notify me immediately and permanently delete the message and any prints or other copies.

**From:** Carole Dulisse <cdulisse@marrlawfirm.com>
**Sent:** Tuesday, May 3, 2022 4:41 PM
**To:** Lance Leffel <lleffel@gablelaw.com>
**Cc:** E. Talitha Ebrite <tebrite@gablelaw.com>; Ashlyn Smith <asmith@gablelaw.com>; Trisha Parent <tparent@marrlawfirm.com>; Jeff Marr <jeffdmarr@marrlawfirm.com>
**Subject:** RE: Barnett Production

External email – beware of links and attachments

Lance

First, the number of emails is immaterial – if it is State Farm's position that the emails pertain to the rules and believe them to be responsive then produce them.

Second, the RFP was not written for personal rules created or triggered on Barnett. Rather, the RFP as written and compelled by the Court seeks: any and all Personal Rules, Program Rules and Personal Program Rules, which State Farm has had in place pertaining to or effecting Xactimate estimates from 2010 to present. If it is State Farm's position that "no Personal Rules, Program Rules or Personal Program Rules" exist, but rather are nothing more than friendly reminders created at the unfettered and unscripted discretion of an adjuster, then State Farm needs to proffer an affidavit stating this.

**EXHIBIT 2** ____________

Lastly, see the Agreed Order attached. It was sent to Mr. Smith while I was in New York – a copy of that email also attached.

Carole Dulisse
Attorney

MARR
LAW FIRM

4301 Southwest Third Street
Oklahoma City, OK 73108
Telephone: (405) 236-8000
Facsimile: (405) 236-8025
Toll Free No.: (800) 516-4299
Website: www.marrlawfirm.com

**From:** Lance Leffel <lleffel@gablelaw.com>
**Sent:** Tuesday, May 3, 2022 3:49 PM
**To:** Carole Dulisse <cdulisse@marrlawfirm.com>
**Cc:** E. Talitha Ebrite <tebrite@gablelaw.com>; Ashlyn Smith <asmith@gablelaw.com>; Trisha Parent <tparent@marrlawfirm.com>
**Subject:** RE: Barnett Production

Carole,

A few things on this –

First, I misspoke in my e-mail below, there are closer to 600,000 e-mails.

Second, State Farm does not maintain a list of "personal rules." There are no company or enterprise wide personal rules. As the name suggests the rules are personal to individual users of Xactimate. So for example, if user John Doe wants to be notified through Xactimate that a new assignment has arrived; or that an estimate created exceeds a certain amount; or that an estimate was uploaded without a sketch – these are all rules that users can create for themselves and when the rule is triggered, they receive an e-mail

notification. When a rule is triggered, the only documentation of the rule is the e-mail notice of a trigger for a "personal program rule." There were no personal rules created or triggered pertaining to the Barnett claim.

Finally, as we communicated on April 11, we did not object to your request to file a response to the pending MSJ by May 6. We never entered any type of order on that to my knowledge. I'm fine either way, just want to make sure that we are all on the same page that we should receive the response by May 6.

Thanks,

**Lance Leffel** (He/Him/His) | Shareholder | **GableGotwals**
(w) 405-235-5582 | (f) 405-235-2875 | lleffel@gablelaw.com
BOK Park Plaza | 499 W. Sheridan Avenue, Suite 2200
Oklahoma City, OK 73102 | USA | Bio | Download vcard | www.gablelaw.com |

This message and any attachments are for the addressee only and may contain privileged or confidential information. If you have received this in error, please notify me immediately and permanently delete the message and any prints or other copies.

**From:** Lance Leffel
**Sent:** Thursday, April 14, 2022 2:54 PM
**To:** Carole Dulisse <cdulisse@marrlawfirm.com>
**Cc:** E. Talitha Ebrite <tebrite@gablelaw.com>; Ashlyn Smith <asmith@gablelaw.com>
**Subject:** Barnett Production

Carole,

I understand you are out this week for depositions. In response to the request about personal rules, the review has identified 160,000 or more e-mails where a personal rule was triggered. There were no personal rules associated with the Barnett claim. We have pulled a representative sample of 5 of these responsive e-mails. We are prepared to produce everything, but that will take some time to redact and process. We wanted to discuss this with you to verify whether or not you want this full production before we finalize it. Let's discuss when you have a moment.

Sincerely,

**Lance Leffel** (He/Him/His) | Shareholder | **GableGotwals**
(w) 405-235-5582 | (f) 405-235-2875 | lleffel@gablelaw.com
BOK Park Plaza | 499 W. Sheridan Avenue, Suite 2200
Oklahoma City, OK 73102 | USA | Bio | Download vcard | www.gablelaw.com |

This message and any attachments are for the addressee only and may contain privileged or confidential information. If you have received this in error, please notify me immediately and permanently delete the message and any prints or other copies.

**EXHIBIT 2**

# EXHIBIT 3

policies, procedures, guidelines, and training materials which were relied upon or utilized by State Farm with respect to Plaintiffs' Claim.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:** State Farm will produce the documents identified in its Answer to Interrogatory No. 8.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 35:** Subject to and without waiving its objections, State Farm supplements its initial response by directing Plaintiffs to BARNETT00000001PROD–00000447PROD, BARNETT00000500PROD, BARNETT00000501PROD–00000522PROD, BARNETT00000523PROD–00000581PROD, BARNETT00000582PROD–00000785PROD, BARNETT00000786ROD–00000842PROD, BARNETT00000843PROD–00000844PROD, BARNETT00000845PROD–00000915PROD, BARNETT00000951PROD–00000955PROD, BARNETT00000956PROD–00001817PROD, BARNETT00002900PROD–00003309PROD, BARNETT00003310PROD– BARNETT00003699PROD.

**REQUEST FOR PRODUCTION NO. 36:** Produce copies of any and all Personal Rules, Program Rules and Personal Program Rules, which State Farm has had in place pertaining to or effecting Xactimate estimates from 2010 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** State Farm objects to this request on the grounds that it is not relevant to any party's claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case considering the importance of the issues at stake in the action, the parties' relative access to relevant information, the parties' resources, the amount in controversy, the importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery, which



**EXHIBIT 3**

outweighs its likely benefit. State Farm also objects to this request as vague, ambiguous, and overly broad in scope, time, and geography, as the request is not reasonably tailored to include only those matters relevant to the handling of the insurance claim made the basis of this suit. State Farm further objects to this request in that it appears to be constructed for the sole purpose of harassing and placing an improper burden on State Farm that is disproportionate to the needs of this case. State Farm further objects in that this request may cover materials which are confidential, proprietary business information and/or trade secret.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** Subject to and without waiving its objections, State Farm supplements its initial response by stating there are no such documents in State Farm's custody or control. State Farm does not maintain a list of "personal rules." There are no company or enterprise wide personal rules. Personal rules within Xactimate are rules that users can create for themselves and, when the rule is triggered, they receive an e-mail notification. When a rule is triggered, the only documentation of the rule is the e-mail notice of a trigger for a "personal program rule." There were no personal rules created or triggered pertaining to the Barnett claim.

**REQUEST FOR PRODUCTION NO. 37:** Produce full and complete copies of all underwriting guidelines and training materials which were relied upon or utilized by State Farm, and/or its Agents with respect to issuing Plaintiffs' policy and for each renewal thereafter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:** State Farm objects to this request on the grounds that it is privileged, not relevant to any party's claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in



**EXHIBIT 3**

Respectfully submitted,

Ashlyn Smith

Lance E. Leffel, OBA No. 19511
E. Talitha Ebrite, OBA No. 21162
Ashlyn M. Smith, OBA No. 34025
GABLEGOTWALS
499 West Sheridan Avenue
BOK Park Plaza, Suite 2200
Oklahoma City, OK 73102

Telephone: 405-235-5500
Facsimile: 405-235-2875
Email: lleffel@gablelaw.com
tebrite@gablelaw.com

*ATTORNEYS FOR STATE FARM FIRE & CASUALTY COMPANY*

**CERTIFICATE OF MAILING**

This is to certify that on May 23, 2022 a true and correct copy of the above and foregoing document was hand delivered to the offices of:

Jeff D. Marr
Carole Dulisse
MARR LAW FIRM
4301 Southwest Third Street, Suite 110
Oklahoma City, OK 73108

Jo L. Slama
Slama Legal Group
4301 Southwest Third Street
Oklahoma City, OK 73108

*ATTORNEY FOR PLAINTIFFS*

Ashlyn Smith
Ashlyn M. Smith



**EXHIBIT 3**

**VERIFICATION**

I, Brian Ingersoll, am over 21 years of age, and a resident of Maricopa County, Arizona. I swear, under penalty of perjury, that I have read the above and foregoing "State Farm's Supplemental Responses to Plaintiffs' Discovery Requests," that I am familiar with the contents thereof, and that, to the best of my knowledge and belief, the Answers and Responses thereto are true and correct.

Signed this 23 day of May, 2022

By: Brian Ingersoll Digitally signed by Brian Ingersoll Date: 2022.05.23 09:53:30 -07'00'

BRIAN INGERSOLL



**EXHIBIT 3**

# EXHIBIT 4

THE DISTRICT COURT, SIXTH JUDICIAL DISTRICT
GRADY COUNTY, STATE OF OKLAHOMA

STEVEN BARNETT and MARSHA BARNETT,

Plaintiffs,

Case No. CJ-2020-141

VS.

STATE FARM FIRE & CASUALTY COMPANY
ART BAIRD, TODD ROWLAND INSURANCE AGENCY
INC., STEVE BREED D/B/A STEVE BREED
CONSTRUCTION COMPANY., INC.,

Defendants.

---

T R A N S C R I P T

NOW, on this 2nd day of August, 2022, the above-entitled cause comes on for Motion for Sanctions and Motions to Enforce before the Honorable Kory Kirkland, District Judge, sitting in and for the County of Grady.

REPORTED BY: Malinda L. Roy, District Court Reporter



**EXHIBIT 4**

# A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF

Marr Law Firm
Jeff Marr, Attorney at Law
Carole Dulisse, Attorney at Law
Jo Slama, Attorney at Law
4301 Southwest 3rd Street, Suite 110
Oklahoma City, Oklahoma 73108

ON BEHALF OF THE DEFENDANTS

GableGotwals
Lance E. Leffel, Attorney at Law
Ashlyn M. Smith, Attorney at Law
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, Oklahoma 73102
405-235-5500

Attorneys for Defendants, State Farm Fire & Casualty Company, Art Baird, and Todd Rowland Insurance Company

Wilson, Cain & Acquaviva
Kevin Walos, Attorney at Law
300 N.W. 13th Street, Suite 100
Oklahoma City, Oklahoma 73103

Attorney for Steve Breed D/B/A Steve Breed Construction Co., Inc.



**EXHIBIT 4**

the replacement cost of the home.

Now, they make a lot of assumptions doing that, but nevertheless that's the program that they use. They train their claim handlers to limit the damage. When the time comes to make the claim, the claim handlers, make no mistake, they're limited. They're trained to limit their damage.

Now, the estimating software that the Court ordered, we talked about it. And it was my position then that they were using estimating software to lower indemnity payments. You can't do that.

They will all testify freely that it is bad faith to use a claim estimating software to reduce indemnity payments by one dollar. It's not what it's for. You want to be more efficient, you want to be quicker, you want to be more expedient? That's fine. You want to save time, all those things, but you cannot use any type of estimating software where the objective is, basically, cheat your policyholders, pay them one dollar less than what they're entitled to because indemnity is what indemnity is.

What we have suspected these before, and what we have since learned is that in order to -- do you mind?

THE COURT: You're free to move about the courtroom.

MR. MARR: That in order to ensure that these claim



**EXHIBIT 4**

handlers limit the damage, they have rules, rules within the software. And these rules are hidden. Policyholder never sees them. Most lawyers never see them. In fact, most people never figure it out.

And I would equate those rules to something like, when you have kids and you take them to the bowling alley. And you want to make sure that their balls don't end up in the gutter, you want to make sure that they hit the mark and hit the pin.

So what do you do? You flip the -- the rails down, and bumpers down. And that makes sure that when the ball leaves their hand it makes it all the way to the desired target and that's the pins. That's what those rule are. Almost like little buoys along the way.

For example, overhead and profit. If overhead and profit's paid I want that to trigger a flag that goes up so, management has to review it.

If -- if a roof claim is paid for $500 in Grady County, I want a flag so management has to look at it.

If taxes are included, if you consider too many items in the home to be premium qualify, I want flags. So all of these things are triggered.

And what happens is, that ensures that management looks at it and management has to make a decision to override or approve. Everytime a flag is triggered it has



**EXHIBIT 4**

benefits of those documents at the time.

It continues in another document that they produced, talk about how you do it. And these are things that you have to go out when you do that inspection you got to look at.

The shape of the home.

The exterior features.

The interior features.

The cabinets and countertops.

They all make sense. How are you gonna determine the value if you don't know those things? And then if you have any questions, go here. "Review the Xactware 360Value Estimating Tool Resource and the Estimated Replacement Cost Tool Training."

Was that produced? No, it wasn't produced.

The rules. We talked about the rules. The hidden rules that control the adjuster and the supervisors and everybody else's behavior so as to ensure that those goals, those targets, those business objectives that come down from corporate every year are satisfied.

You ordered this produced. "Produce copies of any and all Personal Rules, Program Rules, Personal Program Rules, which State Farm has had in place pertaining to or effecting Xactimate estimates from 2010 to present."

Now, if that language looks funny, it's not mine.



**EXHIBIT 4**

complied with is not whether it's easy, or even organized, or that the responses be narrowly tailored. In fact, I think it's the nature of discovery that it's not a narrowly tailored process. It's a broad process.

And I -- I do think the defendant was able to articulate a logical basis for the responses listed in that larger materials, larger courses, et cetera were turned over.

Not unlike if I said, give me everything you've got about knots and I sent you the Boy Scout Handbook and you stand up and say well what's this section about outdoor cooking? I -- I think that's reasonable. And so I don't think that I see any bad faith in any over-responsiveness to discovery.

That being said, I think the plaintiff has certainly demonstrated today that there are Personnel Rules, underwriting documents, and dropdown verification materials that are discoverable, that are in existence, that have not been turned over, as well as agent training materials.

The issue of, what is a call and confer? How do we deal with that in a situation like this when the plaintiff says I know you have more than you gave me because I have these other documents.

I -- I -- I -- I'm sensitive to the defendant's argument that says I -- I don't know what he's talking



**EXHIBIT 4**

And I guess the idea that the Court astutely noticed, asking us for a list of documents that were produced in other cases is not how discovery is supposed to work. State farm -- they are State Farm's documents. And certainly we don't have access to all of their documents.

In the tornado litigation in the Misner case, lots of documents were produced in that case, and -- and they were. However, Your Honor, when the case was settled there was a pending motion for sanctions on all the other stuff they didn't want to produce.

And -- and that's kind of where -- where this falls. Like, he -- he wants us to -- for us to have the burden to say what's missing.

And what we're suggesting is, is the burden is actually on State Farm. And perhaps maybe the easiest way to do that are the things that I've identified, to identify the people, start with the training index. These are -- there are ways that we can maybe ferret this down to -- to a manageable level.

THE COURT: Okay. Often times in the law it's the Court's job not to find a good solution, but to find the least bad. And that's where I am on this case.

I -- I don't like any of the ideas that I have or that I've heard, I just don't. I dislike them all, but, here's what I know, I know that I have seen in this case



**EXHIBIT 4**

evidence of inconsistent discovery results that in one case, in this case, there has been denials that things exist, that appear in other cases.

That is -- that is odious to my sense of justice. And it's my job as a judge to make sure that we have a discovery system with some kind of teeth, some way to ensure justice. And a fundamental principle of justice is that -- that similarly situated individuals are treated in a similar manner.

It's axiomatic. And it's not what's happened in this case. That disappoints me.

So here's what I'm gonna do, I am going to order number one, that the dropdown index which was requested at the beginning of this -- this hearing will be turned over as a -- as a rubric that can be used to identify basic systems of compliance.

I also am going to order that an actual State Farm employee be designated as to having relevant knowledge as to the acquisition of discovery.

And I do think that it will be appropriate to take limited depositions of those employees just to ascertain the due diligence methods of complying with that discovery. Not work product, but due diligence methods. What -- what type of key word search was punched in here, that type of stuff.

I don't like this additional layer of the discovery



**EXHIBIT 4**

process, but the only other thing that's been presented to me is to essentially, in a lot of ways, rip up the protective order.

I know that the words, "modify slightly" have been used, but the fundamental idea behind the protective orders that I give are, attorney eyes only, this case only.

I say that all the time sitting here in cases like this. If I get rid of the, "this case only thing," that's half -- that essentially eliminates the purpose of the protective order. I don't want to do that.

The other side of that, it's a general rule of evidence that you never get to lie. Almost anything that's inadmissible is admissible for impeachment purposes. That's just basic law of evidence.

And so if this doesn't work, these steps that I'm taking here don't work, that's probably gonna be next on the list.

In regard to sanctions, I'm going to reserve ruling on those issues for a couple of reasons. One is, I just want to make it real clear that everybody understands where I am moving forward.

And number two, a lot of those facts will probably depend on what -- what comes out of the depositions that I'm gonna order.

Is this an artfully crafted remedy? I don't like



EXHIBIT 4

# EXHIBIT 5

EXHIBIT 5

SFnet ClaimsNet

State Farm

| Glass Claims | MMG | P&C Claims | Replacement Service | SIU | Subrogation | TIPP | Workers Comp |
|---|---|---|---|---|---|---|---|
| ClaimsNet Home | Auto Claims | CA&P | Catastrophe | CRASH | Estimatics | Fire Claims | SDMU |

Search

GO

## ClaimsNet: Applications & Training: Fire

**Xactimate®**

- Xactimate 301 Training - Advanced Users
- Residential Valuation Training
- Xactimate Security Rights Request
- Xactimate Training

**XactAnalysis®**

- Custom Reporting Groups
- OG 781 120, XactAnalysis
- Personal Rules
- XactAnalysis® Overview

**XactNet®**

- XactNet Request Form

BARNETT000002690PROD

# EXHIBIT 6

THE DISTRICT COURT, SIXTH JUDICIAL DISTRICT
GRADY COUNTY, STATE OF OKLAHOMA

STEVEN BARNETT and MARSHA BARNETT,

Plaintiffs,

vs. Case No. CJ-2020-141

STATE FARM FIRE & CASUALTY COMPANY
ART BAIRD, TODD ROWLAND INSURANCE AGENCY
INC., STEVE BREED D/B/A STEVE BREED
CONSTRUCTION COMPANY., INC.,
Defendants.

T R A N S C R I P T

NOW, on this 19th day of September, 2022, the above-entitled cause comes on for Motion Hearing before the Honorable Kory Kirkland, District Judge, sitting in and for the County of Grady.

REPORTED BY: Malinda L. Roy, District Court Reporter



**EXHIBIT 6**

# A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF

Marr Law Firm
Jeff Marr, Attorney at Law
Carole Dulisse, Attorney at Law
Revell Parrish, Attorney at Law
4301 Southwest Third Street, Suite 110
Oklahoma City, Oklahoma 73108

ON BEHALF OF THE DEFENDANTS

GableGotwals
Lance E. Leffel, Attorney at Law
Ashlyn M. Smith, Attorney at Law
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, Oklahoma 73102
405-235-5500

Attorneys for Defendants, State Farm Fire & Casualty Company, Art Baird, and Todd Rowland Insurance Company

Wilson, Cain & Acquaviva
Kevin Walos, Attorney at Law
300 N.W. 13th Street, Suite 100
Oklahoma City, Oklahoma 73103

Attorney for Steve Breed D/B/A Steve Breed Construction Co., Inc.



**EXHIBIT 6**

(Whereupon, the following proceedings were held in open court.)

THE COURT: Okay. This is Barnett versus State Farm, case number CJ-20-141. I'll let you all introduce yourself for the record. Mr. Marr, we'll start with you.

MR. MARR: Jeff Marr for the plaintiffs.

MS. DULISSE: Carole Dulisse for the plaintiffs.

MR. PARRISH: Revell Parrish for the plaintiffs.

MR. LEFFEL: Lance Leffel for State Farm, Your Honor.

MR. SMITH: Ashlyn Smith for State Farm, Your Honor.

MR. WALLACE: Kevin Wallace for Steve Breed Construction.

THE COURT: You people sitting in the back are you entering an appearance or are you just here to watch.

MS. POARCH: Ashton Poarch, for the plaintiffs.

THE COURT: I didn't hear your name.

MS. POARCH: Ashton Poarch.

THE COURT: Okay. Thank ya.

Okay. I show we're here for the second motion to compel filed by the plaintiff. So, Mr. Marr, go ahead.

MR. MARR: Yes, sir, Judge. We had also by agreement we were going to address the dispute over State Farm's compliance or noncompliance with your order the last



**EXHIBIT 6**

time we were here on August the 2nd. As well as the motion -- the second motion to compel.

So whichever you would prefer to hear first. If you want to hear the second motion to compel first, whatever your preference is, Judge, we'll do it that way.

THE COURT: Let's start with the second motion to compel and we'll go from there.

MR. MARR: Okay. And Ms. Dulisse will handle that if that's okay.

MS. DULISSE: You want me to come up there?

THE COURT: Sure.

MS. DULISSE: So, Judge, we had a meet and confer about this discovery before the motion was filed. And that letter was attached I believe to State Farm's motion.

I can say that we did in fact reach an agreement with regard to the claim files that we sought for five years to McClain and Grady County.

The outstanding issue on that, Your Honor, is they want to redact the property addresses and the policyholder name which we are not in agreement to do. I tried to even offer an olive branch on that as well, I think you can give me the property address, trying to meet somewhere in the middle on that. Still got a hard no on that.

We have a protective order in place. The whole purpose for the claim files and the claim file review as far



**EXHIBIT 6**

they had purportedly spoken with to answer that discovery.

They were supposed to supplement their answers to interrogatories, production requests. As of today, that has not happened.

**At the end of the 45 days, the only person that they've identified as being knowledgeable in discovery is the same guy that had signed the verification back before our hearing happened.**

I think this Court was crystal clear on what you ordered. And, in fact, you know, I heard a lot of testimony today from counsel. No one from State Farm. No -- no affidavits from State Farm. No one from State Farm as to how this works, how this works, how that works, the excuse for this, the excuse for that. Okay.

That was precisely why I believe the Court in its reasoning ordered them to produce all of the folks that were responsible for producing these answers to interrogatories and these purportedly responsive documents. That has not been done.

How they interpreted your order to mean the way they've taken it is beyond me. Why they needed 45 days to identify something that they already signed the verification is beyond me.

The position that they've taken on all the documents that we showed exist and everything from personal



**EXHIBIT 6**

comprehensive knowledge.

However, I then went on and I said, we're going to take depositions of those witnesses.

I don't believe that that was -- I don't believe that was an accident. I did that on purpose. And let me tell you my thinking as we go through this case.

I expect State Farm to produce a witness with comprehensive relevant knowledge that will be meaningful in a deposition situation.

If that witness says well, I don't know, I'd have to ask this person, well, I didn't prepare that, I'm not sure, I'm not familiar with that other case, if that witness cannot in and of themselves be a dropdown index for lack of better terms, then it doesn't comply with my ruling.

If one person has actually familiarized themselves with the process of those 22 different workers and can identify the names of those 22 different workers, how those things did, if one witness can do that, then that's great. I would prefer that we not conduct depositions of 22 individual witnesses if we do not have to.

However, that sounds like a pretty impressive feat given the amount of cases that seem to be floating around, the amount of discovery that seems to be bouncing around. And so I just want to make it clear that I do expect the witness that has been designated to be able to respond in a

meaningful, clarifying way to reasonable questions regarding how the inconsistencies of discovery have occurred and how State Farm is complying with the discovery requests now in a just and fair way.

So, that is my ruling. And it's impossible for me at this point and time to state really whether or not the defendant has complied because that deposition hasn't occurred. I don't know what qualifications that witness has.

**I'm actually impressed if 45 days was taken to prepare this witness and familiarize themselves with the job that 22 people did, then that's a great place to start if that work was actually put in.**

So I'm gonna reserve ruling as to whether or not discovery was complied with until I see what the results are of the deposition of the witness who was designated.

I've already I believe, ruled on the second issue which was the dropdown menu and that compliance and I made my ruling on how we do that. Is there another issue?

MR. MARR: The other documents that were shown to the Court as examples where we got into the, like, what I've shown is what evidence, and you said I'm not entitled -- or required to show confirmation, but what I have shows that there have been many documents that have been -- not been produced that do in fact exist and they haven't produced



**EXHIBIT 6**

And so, we've had that hearing. I decided it was discoverable. Whether or not it's relevant, whether or not there are meaningful reasons for why it wasn't turned over before, those are the things we're gonna talk about in the deposition.

The -- the things that -- that you've responded today and said well, the reason we didn't turn it over in this case is because it didn't exist in this case and it existed in the other case, those are the kind of things that we're gonna learn about when we take our deposition.

That's why I ordered all these things turned over. And that's why I ordered all these things to be looked at so we can measure twice and cut once and we could all be on the same page.

**And so that was my ruling. And I'm gonna stand behind -- behind it. And it's been clear, so now I'm gonna hold you to it. Anything further?**

MR. MARR: Just --

MR. LEFFEL: Timing for production on the matters that were produced -- ordered produced today? I would ask the Court for I think 60 days. I think that was gonna be enough time for these studies and things that have been ordered today.

THE COURT: Mr. Marr.

MR. MARR: On the second request, the documents



**EXHIBIT 6**

# EXHIBIT 7

THE DISTRICT COURT, SIXTH JUDICIAL DISTRICT
GRADY COUNTY, STATE OF OKLAHOMA

STEVEN BARNETT and MARSHA BARNETT,

Plaintiffs,

Case No. CJ-2020-141

VS.

STATE FARM FIRE & CASUALTY COMPANY
ART BAIRD, TODD ROWLAND INSURANCE AGENCY
INC., STEVE BREED D/B/A STEVE BREED
CONSTRUCTION COMPANY., INC.,

Defendants.

---

T R A N S C R I P T

NOW, on this 21st day of November, 2022, the above-entitled cause comes on for Protective Order Motion Hearing before the Honorable Kory Kirkland, District Judge, sitting in and for the County of Grady.

REPORTED BY: Malinda L. Roy, District Court Reporter



**EXHIBIT 7**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF

Marr Law Firm
Jeff Marr, Attorney at Law
Carole Dulisse, Attorney at Law
4301 Southwest Third Street, Suite 110
Oklahoma City, Oklahoma 73108

Nix Patterson, LLP
Nick Marr, Attorney at Law
Ashton Poarch, Attorney at Law
513 North Broadway, Suite 200
Oklahoma City, Oklahoma 73102

ON BEHALF OF THE DEFENDANTS

GableGotwals
Lance E. Leffel, Attorney at Law
Ashlyn M. Smith, Attorney at Law
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, Oklahoma 73102
405-235-5500

Attorneys for Defendants, State Farm Fire & Casualty Company, Art Baird, and Todd Rowland Insurance Company

Wilson, Cain & Acquaviva
Kevin Walos, Attorney at Law
300 N.W. 13th Street, Suite 100
Oklahoma City, Oklahoma 73103

Attorney for Steve Breed D/B/A Steve Breed Construction Co., Inc.



**EXHIBIT 7**

it.

MR. MARR: All right. All right. And -- and we attached it to the brief. And I'm -- you were, I thought very articulate and very clear in that order, but I'll do that on a break.

You want me to do it now or you want me to go forward?

THE COURT: You can go ahead and go forward with your argument and we can --

MR. MARR: Okay.

THE COURT: -- come back to that.

MR. MARR: Secondly, Judge, you know, one of the things that was supposed to happen was, they were supposed to comply with discovery.

They were supposed to produce discovery in advance of the deposition so that I would have time to review it in order to prepare for his deposition.

Okay. Well, shockingly enough, that didn't happen. Friday night they dropped a thumb drive off in my mailbox. I got home. I pulled it up. The first thing I went to was the drop-down menu that the Court established was the rubric, couldn't even open it. I couldn't even open it.

Apparently, there was another password that protected it which was just inadvertently supposedly according to Defense Counsel just -- they just forgot about



**EXHIBIT 7**

it. So I just got it this afternoon. But when we did open it, once, again it was not what the Court ordered.

The Court gave Defense Counsel two choices on how to produce that rubric. And, you know, it had links to it, and it had drop downs and all those things. And we went to great lengths to discuss it. It was not produced as the Court ordered. So in essence, it was useless to me.

As far as the other supplementation, 16 of the production requests that you had ordered produced were not supplemented. Six of the interrogatories that you ordered supplemented were not supplemented.

Even the personal rules, Judge, and you remember what a big deal the personals, were not supplemented. The 600,000-and-something thousand pages of documents that he's talking about, 600,000 of those are the e-mails regarding the personal rules that we referenced previously during our PowerPoint where we told him, we don't want the -- we don't want the e-mails regarding the rules, obviously, we want the rules that the e-mails are discussing. Never produced. To this day we still don't have one personal rule.

So, I mean, we have -- we have problems on two fronts with respect to this deposition:

One, they've now tried to narrow the scope.

And two, they didn't comply with the Court's order. They didn't produce the documents when they were supposed to



**EXHIBIT 7**

have to be able to testify about auto loans, those type things. Then insofar as that's -- that's true, then I -- I agree with the Defendant.

But I want to be clear that this summary of these four things, while I do think it's probably useful to provide your expert with that to prepare them, I'm going to interpret those things liberally and broadly so as to include my previous order.

**So I'm not limiting anything that I ruled in my previous order.** I'm simply stating that my previous order shouldn't be taken to cover things that are not either relevant to the case at hand or relevant to these discovery inconsistencies.

And so it's not a free-for-all go digging for new clients, get into a whole bunch of other things. So I'm gonna treat this as a motion to clarify. And it is clarified. And if you have a dispute from here on out you can use my previous ruling transcript as to that.

And, again, I'll give y'all my cell phone, if something comes up that day, I always take a call. If you're taking a deposition on Christmas day or Thanksgiving I won't, but other than that, I will. That's where we are on that issue.

As to the dropdown indexes, has -- has the Plaintiff had a chance -- since these -- since the password



**EXHIBIT 7**

THE COURT: Can you talk louder?

MS. DULISSE: I can talk louder.

So both the August 2nd hearing and then, again, as part of Plaintiffs' Second Motion to Compel, this SFClaim.net has been -- has been issued.

What was supposed to have been produced, Your Honor, is that ClaimsNet home page the P&C claims, the CA&P Catastrophe, Estimatics, TIPP and Fire Claims.

Once again, nothing has been produced on CA&P, and the ClaimsNet home page that was produced that kind of started all this, doesn't have all of the -- the links, but that -- that in and of itself.

What -- what we have -- or has been produced is a catastrophe page from '19 to 2022. A P&C claims from 2019 and 2022. A TIPP page from 2019 and 2022. An Estimatics page from '19 to 2022. A Fire Claims from 2019 to 2022. And a ClaimsNet -- what purports to be a ClaimsNet page from the year 2019 and 2022.

The Court's order, as I understood it, was to cut and paste this webpage and drop it into a -- its own sanitized little webpage, Mirror that, if you will, so that I could click on the links and navigate around.

**What we have are folders, within folders, within folders, within folders of single image HTML pages that are not linked. They are not navigable.** And they are in truly



**EXHIBIT 7**

MR. SMITH: Well, and, Your Honor, I don't think we've got this particular file, because this has to do with auto, but see at the bottom it says Auto.wwnb.

So what you should be able to do, and I haven't looked at this specific -- specific folder as an example, but I could look at another one that I just checked to make sure it worked, but you would go folder up.

You'd either see that file name in the folder where this link is or you to go down a folder. Or you could go up -- if you're using Windows Explorer go up into the search field and just type that in and you can find it that way.

That's how this was done in a similar case, I think in Illinois, and this is how State Farm produced it. And it seemed it was sufficient in that case. And so we tried to replicate that same model here. And that's just what it looks like.

MS. DULISSE: And that doesn't comply with the Court's order. And if the Court will recall on September 30th hearing, this was proposed, and you rejected it. You said I gave you two options, I don't care which one you do, we're not gonna redo this.

What that did, is apparently not hear one word you said and did exactly what they wanted to do. This is no easier to function. I've gone through, I've opened up every one of these folders. And this is -- this is what you're



**EXHIBIT 7**

dealing with, Judge (indicating).

You have to open -- I mean, you -- you have to open up every one of these folders is what they're saying, and find the link that you want that's responsive to that. That is not what the Court ordered.

This is no different than trying to shuffle together a bunch of PDF papers. This in fact -- and in fact, remarkably, their own expert admitted it could be done.

You can link all of these pages together so it works just like a website, they just chose not to do it. That was the Court's order, they have not complied. This is not sufficient.

I have opened up every single one of these folders, and separate static HTML files, which is essentially what they are, and it -- it makes no sense.

MR. LEFFEL: Your Honor, I -- I completely disagree. One of the options you gave us was the cut-and-paste option. And this is so far beyond my pay grade, I -- I can't fix it.

I mean, we had to hire somebody. Typically, the obligation in discovery is a party does not have to create something that does not exist.

We have actually gone above and beyond by hiring somebody that has expertise that I could never possess to



EXHIBIT 7

indices.

So it doesn't comply with the Court's order. Because the whole point of using this as rubric, it is to access the information, all of the information within the dropdown.

And all they're doing is giving you static image still shots now of the HTML because they're still not navigable, you still can't pull up the actual information. And that's not what the Court ordered.

It's hard to use this as a rubric when this is -- they're saying here ya go. Now, because these -- this page, (indicating) where it talks about the Standards Claim Processes and all the little sub-folders in here, they didn't -- there's no link -- HTML links for those.

**They didn't give us the full XactAnalysis page list, the pages. So for the XactAnalysis for the personal rules that was ordered by this Court, there's no -- there's no hyperlink for that. And there's no HTML static image of that.**

And therein lies the problem. The Court ordered this to -- to do two things:

Either reproduce this website in a navigable form, which it can in fact be done. And we'd argue, Your Honor, it was probably cheaper and would have taken less time to link it together and do it the way the Court wanted it,



**EXHIBIT 7**

existence, and something along these lines would be appropriate for that.

But the documents that are currently in existence -- and -- and, Mr. Leffel, you -- you said very well, the Defendant doesn't have a duty to create documents. That's correct. However, if the Defendant chooses not to turn a document over in the format that -- that -- that they have it in, there has to be some alternative way.

**And so, what I'm gonna order is, the documents in existence, I'm still ordering need to be turned over as I ordered in a clickable way.**

**However, something from 1999, that is not currently linked to the website and you can't do those things, I think something like this for those documents is appropriate. So that's where that is.**

MR. LEFFEL: Just to be clear, initially we produced PDFs that were -- that were captures of what's on the website. So then we were given two options:

Either a live website, which doesn't exist.

Or two, to do a cut-and-paste.

I -- I think we 100 percent in our understanding and through significant effort created the cut-and-paste option for this Court.

And we've demonstrated for the Court how -- I don't understand what more we can do other than go and create them



**EXHIBIT 7**

# EXHIBIT 8

THE DISTRICT COURT, SIXTH JUDICIAL DISTRICT
GRADY COUNTY, STATE OF OKLAHOMA

STEVEN BARNETT and MARSHA BARNETT,

Plaintiffs,

Case No. CJ-2020-141

VS.

STATE FARM FIRE & CASUALTY COMPANY
ART BAIRD, TODD ROWLAND INSURANCE AGENCY
INC., STEVE BREED D/B/A STEVE BREED
CONSTRUCTION COMPANY., INC.,
Defendants.

---

T R A N S C R I P T

COURT'S RULING ONLY

NOW, on this 16th day of March, 2023, the above-entitled cause comes on for Motion for Sanctions Hearing before the Honorable Kory Kirkland, District Judge, sitting in and for the County of Grady.

REPORTED BY: Malinda L. Roy, District Court Reporter



**EXHIBIT 8**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF

Marr Law Firm
Jeff Marr, Attorney at Law
Carole Dulisse, Attorney at Law
4301 Southwest Third Street, Suite 110
Oklahoma City, Oklahoma 73108

Nix Patterson, LLP
Nick Marr, Attorney at Law
Ashton Poarch, Attorney at Law
512 North Broadway Avenue, Suite 200
Oklahoma City, Oklahoma 73102

ON BEHALF OF THE DEFENDANTS

GableGotwals
Lance E. Leffel, Attorney at Law
Brenen Barger, Attorney at Law
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, Oklahoma 73102
405-235-5500

Redgrave
Erica B. Zolner, Attorney at Law
230 West Monroe Street
Suite 210
Chicago, Illinois 60606

Wilson Cain and Acquaviva
Kevin Walos, Attorney at Law
300 NW 13th Street
Suite 100
Oklahoma City, Oklahoma 73103

McCalla Brown Patel
Jeromy Brown, Attorney at Law
126 West Chickasha Avenue
Chickasha, Oklahoma 73018

Attorneys for Defendants, State Farm
Fire & Casualty Company, Art Baird, and
Todd Rowland Insurance Company and Steve
Breed Construction Company, Inc.



**EXHIBIT 8**

THE COURT REPORTER: I can't hear you.

MR. LEFFEL: You're not showing -- your not disclosing, you're not --

THE COURT REPORTER: I can't hear you, sir.

MR. LEFFEL: -- publishing it. You're just saying I know it was produced in this case it was -- it was Bates, you know, number 99.

THE COURT: Well, I -- I've made my ruling. I think I have worked very hard to tailor a remedy that addresses the inconsistencies we're dealing with in a way that still gives teeth to the protective order I've already entered in. And so --

MR. LEFFEL: Thank you.

THE COURT: -- that's what I'm gonna do.

MS. DULISSE: One point of clarification for purposes of the depositions, would it be fair for us to identify a handful of folks that we think of the sourced people and then present them, you know, like five or six?

You know, cause I agree, 35 seems -- seems like an ominous task, but is it fair for us to present to them the folks we think can get us there?

THE COURT: I think I said three. You're asking for five?

MS. DULISSE: No, I'm -- I'm -- I was, no. I was really just using just random numbers. So but I'm saying we



EXHIBIT 8

can pick the -- the -- the three people that we -- with Angela -- does that include Angela King or three more?

I just want to make sure we understand each other versus -- because when we say "designate," I want to make sure they don't take that to mean that they can go appoint someone other than the sourced --

THE COURT: You're picking them.

MS. DULISSE: We're picking them?

THE COURT: You're picking them.

MS. DULISSE: Okay.

THE COURT: You're gonna pick from the 35 names.

MS. DULISSE: Perfect.

THE COURT: I assume the 35 names with the list that you've turned over also say, Witness A worked with case one? Okay.

MS. DULISSE: Yes. Okay. That's the clarification I needed.

THE COURT: I said -- I think I said one, and then if you wanted to add two or three more. If you add that together that's four.

MS. DULISSE: That's --

THE COURT: If you're telling me that you need five in good faith, I would rather let you have five than have another one of these hearings.

MS. DULISSE: Yes.



EXHIBIT 8

MR. MARR: I'd say five just to be safe.

THE COURT: Okay.

MR. LEFFEL: And maybe we won't need it.

THE COURT: Five's a lot less than 35.

MS. DULISSE: It is. Thank you for the clarification.

THE COURT: But you also know I generally say ask for what you want, cause that's all you're getting. So --

MS. DULISSE: True.

THE COURT: -- okay. You got your five, we got that. It's good to see y'all. Have a good day.

(Whereupon, the following proceedings were concluded.)



**EXHIBIT 8**

# EXHIBIT 9

**IN THE DISTRICT COURT OF GRADY COUNTY**
**STATE OF OKLAHOMA**

| | | |
|---|---|---|
| STEVEN BARNETT and MARSHA BARNETT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE FARM FIRE & CASUALTY COMPANY, ART BAIRD, TODD ROWLAND INSURANCE AGENCY, INC., STEVE BREED D/B/A STEVE BREED CONSTRUCTION CO., INC., | ) | Case No. CJ-20-141 |
| | ) | |
| Defendants. | ) | |

**STATE FARM'S SUPPLEMENTAL RESPONSES TO**
**PLAINTIFFS' DISCOVERY REQUESTS**

Defendant State Farm Fire & Casualty Company ("State Farm" or "Defendant") submits the following supplemental answers and responses to the interrogatories and requests for production (collectively, "Requests") of Plaintiffs Steven Barnett and Marsha Barnett ("Plaintiffs").

**GENERAL OBJECTIONS**

State Farm incorporates herein by reference its General Objections set forth in State Farm's initial answers and responses to the Requests below.

**FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:** Identify each Person who has supplied Documents, facts, data, and/or information upon which Your Answers to these Discovery Requests are based.

**ANSWER TO INTERROGATORY NO. 1:** State Farm objects that this interrogatory is overly broad and seeks information beyond that which is relevant and reasonably calculated to lead



**EXHIBIT 9**

to the discovery of admissible evidence in this matter. Subject to and without waiving its objections, State Farm states that these interrogatories are being answered by Brian Ingersoll with the assistance of counsel.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 1:** Subject to and without waiving its objections, State Farm supplements its initial response by stating the information and documents referred to herein were provided by various State Farm department contacts. The documents provided are the business records of State Farm.

**SECOND SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 1:** Subject to and without waiving its objections, the following individuals were involved in gathering documents or information in response to Plaintiffs' discovery requests in this case:

1. Amanda Rakers (Records Specialist, HR&D-Talent Operations);
2. Angela King (Learning Analyst Op Support-Training);
3. Angela Null (Claim Consultant, Consulting Services);
4. Annette Rose (Senior Research Analyst, Enterprise Research);
5. Blaise Hilgenbrinck (Technology Analyst, EntTech-P&C);
6. Brandon Revels (Agency Operations Analyst, Agency/Sales Resources);
7. Chellie Miller (P&C Underwriting Analyst, Op Strategy & Modernization);
8. Christy Patton (Learning Analyst Op Support);
9. Dianna Chapman (Operations Specialist HR&D – Talent Operations);
10. Donald Vinciguerra (Staff Planning & Analysis Analyst P&C Analytics);
11. Eric Miller (P&C Underwriting Analyst);
12. Gary Trueheart (Process Manager, Op-Excellence);
13. James Meyer (Procurement Category Manager, ADSV-Purchasing);
14. Janet Mileur (Process Analyst, Op-Excellence);
15. Janine McGill (Program Manager – Consulting Services);
16. Jeffrey Wyrick (Analyst, VMSO, Business Tech Vendor Mgmt);
17. John Kuntz (Team Manager, Consulting Services);



**EXHIBIT 9**

18. Joi Hayes (Operations Specialist – HR&D Talent Operations);
19. Kari Keeton (Technology Analyst – HR&D Talent Operations);
20. Kevin Rogers (Technical Administrator);
21. Linda Mantin (Talent Management Analyst – HR&D Talent Management);
22. Michael Jensen (Consultant, EC&S, Enterprise Consulting & Strategy);
23. Michelle Smith (Senior underwriter, Portfolio Management);
24. Phil Rolfs (Procurement Category Manager, ADSV-Purchasing);
25. Robert Haines (Technology Analyst, EntTech-P&C Claims);
26. Ryan Clouse (Data Analyst EntTech-Gen Depts & Finance);
27. Sharon Arnold (Section Manager – Proximity Home & Commercial-Proximity);
28. Shelley M McClure (Process Analyst – Op Excellence-POST);
29. Sherry Parker (Modeling & Technology Manager);
30. Susan Maynard (Claim Consultant, Consulting Services);
31. Tanya Potts (Learning Team Manager – Op Support-Training);
32. Tim Burley (Learning Analyst-Op Support – Training);
33. Tom Moss (Claim Consultant, Consulting Services);
34. Traci Saiz (Agency & Marketing Learning);
35. Trent Shickel (Enterprise Technology Manager).

**INTERROGATORY NO. 4:** For each person you expect to call to testify at trial as an expert witness:

a) Identify him;

b) State the subject matter on which he is expected to testify;

c) State the substance of the facts and opinions to which he is expected to testify;

d) Provide a summary of the grounds for his opinions;

e) List his qualifications, including a list of all publications authored by him in the preceding ten (10) years;

f) State the compensation paid or to be paid to him for his testimony and for his preparation for his testimony; and

g) Provide a list of any other cases in which he has testified as an expert at trial or by deposition in the preceding four (4) years.



**EXHIBIT 9**

Respectfully submitted,

Ashlyn Smith

Lance E. Leffel, OBA No. 19511
E. Talitha Ebrite, OBA No. 21162
Ashlyn M. Smith, OBA No. 34025
GABLEGOTWALS
499 West Sheridan Avenue
BOK Park Plaza, Suite 2200
Oklahoma City, OK 73102

Telephone: 405-235-5500
Facsimile: 405-235-2875
Email: lleffel@gablelaw.com
tebrite@gablelaw.com
asmith@gablelaw.com

***Attorneys For Defendant***
***State Farm Fire & Casualty Company***



**EXHIBIT 9**

**VERIFICATION**

Brian Ingersoll, under penalty of perjury, states that he is employed by State Farm Fire and Casualty Insurance Company ("SFFCC"); that he verifies the foregoing Interrogatory Responses on behalf of SFFCC, and is duly authorized to do so; that the facts and matters set forth herein have been assembled by authorized employees and counsel of SFFCC; and that he believes that the facts and matters set forth herein are true.

Dated: November 18, 2022.

______________________________

Brian Ingersoll



**EXHIBIT 9**

## CERTIFICATE OF MAILING

This is to certify that on November 18, 2022 a true and correct copy of the above and foregoing document was produced via U.S. Mail and emailed to the offices of:

Jeff D. Marr, OBA No. 16080
Carole Dulisse, OBA No 18047
MARR LAW FIRM
4301 Southwest Third Street Suite 110
Oklahoma City, Oklahoma 73108

and

Jo L. Slama
Slama Legal Group
4301 Southwest Third Street. Suite 120
Oklahoma City, OK 73108

and

Reggie Whitten, OBA No.: 9576
Michael Burrage, OA No. 1350
J. Revell Parrish, OBA No. 30205
WHITTEN BURRAGE
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102

and

Chad E. Ihrig, OBA No. 19491
Nick Marr, OBA No. 34284
Ashton Poarch, OBA No. 34308
NIX PATTERSON, LLP
512 Broadway Ave, Suite 200
Oklahoma City, OK 73102

***Attorneys for Plaintiffs***

Ashlyn Smith
Ashlyn M. Smith



**EXHIBIT 9**

# EXHIBIT 10

**Subject:** RE: Barnett vs. State Farm, et al.
**Date:** Friday, July 21, 2023 at 2:41:14 PM Central Daylight Time
**From:** Lance Leffel
**To:** Trisha Parent, Ashlyn Smith
**CC:** Jeff Marr, Carole Dulisse, Jo L. Slama (jo@slamalegal.com), madison@slamalegal.com, Reggie Whitten, Michael Burrage, rparrish@whittenburragelaw.com, burtz@whittenburragelaw.com, Chad Ihrig, Nick Marr, Ashton Poarch, kevinw@wcalaw.com, Kari Cyrs, Janet L. Wright, Karen S. Speed, jbrown@mbplegal.com, jswapp@mbplegal.com, tgilmore@mbplegal.com, Erica Zolner

Counsel,

I believe the final witness Plaintiffs requested under the court order for individuals involved in providing information or documents in response to discovery is Tom Moss. Mr. Moss is available on August 17 for a deposition by remote means. Please let me know if this date will work for you.

**Lance Leffel** (He/Him/His) | Shareholder | **GableGotwals**
(w) 405-235-5582 | (f) 405-235-2875 | lleffel@gablelaw.com
BOK Park Plaza | 499 W. Sheridan Avenue, Suite 2200
Oklahoma City, OK 73102 | USA | Bio | Download vcard | www.gablelaw.com |

This message and any attachments are for the addressee only and may contain privileged or confidential information. If you have received this in error, please notify me immediately and permanently delete the message and any prints or other copies.

**From:** Trisha Parent <tparent@marrlawfirm.com>
**Sent:** Tuesday, July 11, 2023 3:26 PM
**To:** Lance Leffel <lleffel@gablelaw.com>; Ashlyn Smith <asmith@gablelaw.com>
**Cc:** Jeff Marr <jeffdmarr@marrlawfirm.com>; Carole Dulisse <cdulisse@marrlawfirm.com>; Jo L. Slama (jo@slamalegal.com) <jo@slamalegal.com>; madison@slamalegal.com; rwhitten@whittenburragelaw.com; mburrage@whittenburragelaw.com; rparrish@whittenburragelaw.com; Barbara Urtz <burtz@whittenburragelaw.com>; cihrig@nixlaw.com; nmarr@nixlaw.com; Ashton Poarch <apoarch@nixlaw.com>; kevinw@wcalaw.com; Kari Cyrs <kcyrs@gablelaw.com>; Janet L. Wright <jwright@gablelaw.com>; Karen S. Speed <kspeed@gablelaw.com>; jbrown@mbplegal.com; jswapp@mbplegal.com; tgilmore@mbplegal.com; ezolner@regravelllp.com
**Subject:** Barnett vs. State Farm, et al.

External email – beware of links and attachments

Please see attached. A hard copy has been mailed.

Trisha Parent
Legal Assistant to Jeff D. Marr

MARR
LAW FIRM

4301 Southwest Third Street
Oklahoma City, OK 73108
Telephone: (405) 236-8000
Facsimile: (405) 236-8025
Toll Free No.: (800) 516-4299
Website: www.marrlawfirm.com

CONFIDENTIALITY NOTICE

This email contains confidential information belonging to the sender which is legally privileged. This information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this emailed information is strictly prohibited. If you feel you have received this email in error, please immediately notify me by replying to the email and by telephone at (405) 236-8000.

# EXHIBIT 11

BARNETT00631945PROD, BARNETT00631946PROD—BARNETT00631958PROD, BARNETT00631959PROD—BARNETT00632752PROD, BARNETT00632753PROD—BARNETT00634810PROD, BARNETT00634811PROD—BARNETT00634826PROD, BARNETT00634827PROD—BARNETT00634830PROD, BARNETT00634831PROD—BARNETT00634845PROD.

**REQUEST FOR PRODUCTION NO. 36**: Produce copies of any and all Personal Rules, Program Rules and Personal Program Rules, which State Farm has had in place pertaining to or effecting Xactimate estimates from 2010 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36**: State Farm objects to this request on the grounds that it is not relevant to any party's claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case considering the importance of the issues at stake in the action, the parties' relative access to relevant information, the parties' resources, the amount in controversy, the importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery, which outweighs its likely benefit. State Farm also objects to this request as vague, ambiguous, and overly broad in scope, time, and geography, as the request is not reasonably tailored to include only those matters relevant to the handling of the insurance claim made the basis of this suit. State Farm further objects to this request in that it appears to be constructed for the sole purpose of harassing and placing an improper burden on State Farm that is disproportionate to the needs of this case. State Farm further objects in that this request may cover materials which are confidential, proprietary business information and/or trade secret.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** Subject to and without waiving its objections, State Farm supplements its initial response by stating there are no such documents in State Farm's custody or control. State Farm does not maintain a list of "personal rules." There are no company or enterprise wide personal rules. Personal rules within Xactimate are rules that users can create for themselves and, when the rule is triggered, they receive an e-mail notification. When a rule is triggered, the only documentation of the rule is the e-mail notice of a trigger for a "personal program rule." There were no personal rules created or triggered pertaining to the Barnett claim.

**SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** Subject to and without waiving its objections, State Farm supplements its response by stating that State Farm will produce reports of all personal rules that were triggered from January 1, 2010 – December 31, 2022. These reports did not previously exist, but in an ongoing effort to cooperate, State Farm has prepared these reports. The reports include the user, the date the rule was triggered, category of the rule, event that triggered the rule, the claim number that triggered the rule, and the amount of the estimate.

**REQUEST FOR PRODUCTION NO. 37:** Produce full and complete copies of all underwriting guidelines and training materials which were relied upon or utilized by State Farm, and/or its Agents with respect to issuing Plaintiffs' policy and for each renewal thereafter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:** State Farm objects to this request on the grounds that it is privileged, not relevant to any party's claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in

Respectfully submitted,

[signature]

Lance E. Leffel, OBA No. 19511
E. Talitha Ebrite, OBA No. 21162
Ashlyn M. Smith, OBA No. 34025
GABLEGOTWALS
499 West Sheridan Avenue
BOK Park Plaza, Suite 2200
Oklahoma City, OK 73102

Telephone: 405-235-5500
Facsimile: 405-235-2875
Email: lleffel@gablelaw.com
tebrite@gablelaw.com
asmith@gablelaw.com

***Attorneys For Defendant, State Farm Fire & Casualty Company***



**EXHIBIT 11**

**CERTIFICATE OF MAILING**

This is to certify that on March 15, 2023 a true and correct copy of the above and foregoing document was produced via U.S. Mail and emailed to the offices of:

Jeff D. Marr, OBA No. 16080
Carole Dulisse, OBA No 18047
MARR LAW FIRM
4301 Southwest Third Street Suite 110
Oklahoma City, Oklahoma 73108

and

Jo L. Slama
Slama Legal Group
4301 Southwest Third Street. Suite 120
Oklahoma City, OK 73108

and

Reggie Whitten, OBA No.: 9576
Michael Burrage, OA No. 1350
J. Revell Parrish, OBA No. 30205
WHITTEN BURRAGE
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102

and

Chad E. Ihrig, OBA No. 19491
Nick Marr, OBA No. 34284
Ashton Poarch, OBA No. 34308
NIX PATTERSON, LLP
512 Broadway Ave, Suite 200
Oklahoma City, OK 73102

***Attorneys for Plaintiffs***

Jamie E Zoffel
________________________



**EXHIBIT 11**

# EXHIBIT 12

**THIRD SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 23:** Subject to and without waiving its objections, State Farm supplements its initial response by directing Plaintiffs to BARNETT00642855PROD– BARNETT00643577PROD.

**REQUEST FOR PRODUCTION NO. 36:** Produce copies of any and all Personal Rules, Program Rules and Personal Program Rules, which State Farm has had in place pertaining to or effecting Xactimate estimates from 2010 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** State Farm objects to this request on the grounds that it is not relevant to any party's claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case considering the importance of the issues at stake in the action, the parties' relative access to relevant information, the parties' resources, the amount in controversy, the importance of the discovery in resolving the issues, and the burden or expense of the proposed discovery, which outweighs its likely benefit. State Farm also objects to this request as vague, ambiguous, and overly broad in scope, time, and geography, as the request is not reasonably tailored to include only those matters relevant to the handling of the insurance claim made the basis of this suit. State Farm further objects to this request in that it appears to be constructed for the sole purpose of harassing and placing an improper burden on State Farm that is disproportionate to the needs of this case. State Farm further objects in that this request may cover materials which are confidential, proprietary business information and/or trade secret.

**SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** Subject to and without waiving its objections, State Farm supplements its initial response by stating there are no such documents in State Farm's custody or control. State Farm does not maintain a list



**EXHIBIT 12**

of "personal rules." There are no company or enterprise wide personal rules. Personal rules within Xactimate are rules that users can create for themselves and, when the rule is triggered, they receive an e-mail notification. When a rule is triggered, the only documentation of the rule is the e-mail notice of a trigger for a "personal program rule." There were no personal rules created or triggered pertaining to the Barnett claim.

**SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** Subject to and without waiving its objections, State Farm supplements its response by stating that State Farm will produce reports of all personal rules that were triggered from January 1, 2010 – December 31, 2022. These reports did not previously exist, but in an ongoing effort to cooperate, State Farm has prepared these reports. The reports include the user, the date the rule was triggered, category of the rule, event that triggered the rule, the claim number that triggered the rule, and the amount of the estimate.

**THIRD SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 36:** Subject to and without waiving its objections, State Farm supplements its response by directing Plaintiffs to BARNETT00647673PROD– BARNETT00647674PROD and BARNETT00659131PROD–BARNETT00659138PROD,

**REQUEST FOR PRODUCTION NO. 37:** Produce full and complete copies of all underwriting guidelines and training materials which were relied upon or utilized by State Farm, and/or its Agents with respect to issuing Plaintiffs' policy and for each renewal thereafter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:** State Farm objects to this request on the grounds that it is privileged, not relevant to any party's claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the



**EXHIBIT 12**

request for information on Plaintiff's discovery processes."); *Cardinali v. Plusfour, Inc.*, 16-CV-2046, 2019 WL 3456630, at *3 (D. Nev. June 20, 2019) ("discovery on discovery is disfavored"); Fish v. Air & Liquid Sys. Corp., CV-16-496, 2017 WL 697663, at *6 (D. Md. Feb. 21, 2017) ("discovery on discovery . . . is not an appropriate topic of discovery and numerous courts have disallowed such discovery").

**SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 44:** Subject to and without waiving is other objections, State Farm will produce responsive documents.

**SECOND SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 44:** Subject to and without waiving its objections, State Farm supplements its response by directing Plaintiffs to its production of native HTM and HTML files at BARNETT000634846PROD.

**THIRD SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 44:** Subject to and without waiving its objections, State Farm supplements its response by directing Plaintiffs to its production of native HTM and HTML files at BARNETT000658952PROD.

Respectfully submitted,

Lance E. Leffel

Lance E. Leffel, OBA No. 19511
E. Talitha Ebrite, OBA No. 21162
Ashlyn M. Smith, OBA No. 34025
GABLEGOTWALS
499 West Sheridan Avenue



**EXHIBIT 12**

BOK Park Plaza, Suite 2200
Oklahoma City, OK 73102

Telephone: 405-235-5500
Facsimile: 405-235-2875
Email: lleffel@gablelaw.com
tebrite@gablelaw.com
asmith@gablelaw.com

***and***

Erica Blashke Zolner *(Admitted Pro Hac Vice)*
Redgrave, LLP
230 West Monroe Street, Suite 210
Chicago, IL 60606
PH: 312-800-1968
Email: ezolner@regravellp.com

and

Jeromy E. Brown, OBA #17518
Jessica Swapp, OBA #33620
Ty J. Gilmore, OBA #34664
MCCALLA BROWN PATEL LLP
(Mailing) P.O. Box 2220
Chickasha, OK 73023

(Phys.) 126 W. Chickasha Ave.
Chickasha, OK 73018

Telephone: (405) 224-3626
Facsimile: (405) 825-3516
Email: jbrown @mbplegal.com
jswapp @mbplegal.com
tgilmore@mbplegal.com

***ATTORNEYS FOR DEFENDANTS, STATE FARM FIRE & CASUALTY COMPANY, ART BAIRD, AND TODD ROWLAND INSURANCE AGENCY***



**EXHIBIT 12**

**CERTIFICATE OF MAILING**

I do hereby certify that on May 31, 2023, a true, correct and exact copy of the above and foregoing document was served by placing same in the United States mail, with proper postage thereon duly prepaid, to those parties as listed below:

Jeff D. Marr, OBA No. 16080
Carole L. Dulisse, OBA No. 18047
MARR LAW FIRM
4301 Southwest Third Street, Suite 110
Oklahoma City, Oklahoma 73108
*and*
Jo L. Slama
Madison Clark, OBA No.: 32878
SLAMA LEGAL GROUP
4301 Southwest Third Street. Suite 100
Oklahoma City, OK 73108
*and*
Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
J. Revell Parrish, OBA No. 30205
WHITTEN BURRAGE
512 N. Broadway Avenue, Suite 300
Oklahoma City, OK 73102
*and*
Chad E. Ihrig, OBA No. 19491
Nick Marr, OBA No. 34284
Ashton Poarch, OBA No. 34308
NIX PATTERSON, LLP
513 North Broadway Avenue, Suite 200
Oklahoma City, OK 73102
***Attorneys for Plaintiffs***

Kevin M. Walos
Roger K. Gofton
WILSON CAIN & ACQUAVIVA
300 NW 13th Street, Suite 100
Oklahoma City, OK 73103
***Attorneys for Defendant, Steve Breed d/b/a Steve Breed Construction Co., Inc.***

Lance E. Leffel



**EXHIBIT 12**

# EXHIBIT 13

IN THE DISTRICT COURT OF GRADY COUNTY

STATE OF OKLAHOMA

STEVEN BARNETT and
MARSHA BARNETT,

Plaintiffs,

vs.

STATE FARM FIRE & CASUALTY COMPANY; ART BAIRD; TODD ROWLAND INSURANCE AGENCY, INC.; STEVE BREED d/b/a STEVE BREED CONSTRUCTION CO., INC.,

Defendants.

Case Number
CJ-20-141

CERTIFIED COPY

* * * * *

VIDEOCONFERENCE DEPOSITION OF
THOMAS EDWARD MOSS
TAKEN ON BEHALF OF THE PLAINTIFFS
IN BLOOMINGTON, ILLINOIS
ON AUGUST 17, 2023
COMMENCING AT 9:51 A.M. CST

* * * * *

INSTASCRIPT, LLC
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA 73102
405.605.6880
schedule@instascript.net

Reported via Zoom by: Cheryl D. Rylant, CSR, RPR

Video Technician: Jon Womastek

EXHIBIT 13

Page 30

Q. What is Enterprise Technology? What do they do?
A. I don't understand all of their roles. I just know that they work on technology such as ECS and other technologies.
Q. What other technologies?
A. I don't know. I can speak to what I interact with, and I interact with ECS and, you know, the claim tools associated with claim handling.
Q. Right.
What claim tools associated with handling?
A. So, Xactimate, the Xactware products.
Q. What Xactware products?
A. Well, Xactimate, XactContents, XactAnalysis.
Q. Any others?
A. Those are the ones that come to mind.
Q. Okay. So, do you have access to not only ECS but to the Xactware claim products?
A. I do have access to Xactimate, XactContents, and XactAnalysis.
Q. Okay. And what do you do that for?

Page 31

What's your -- the purpose of accessing Xactimate, XactContents, or XactAnalysis?
A. There are many reasons that -- that I might access those.
Q. I know. That's why I ask.
Can you tell me what those are?
A. I can't begin to imagine all the various reasons I might access those.
Q. Okay. Well, why do you access Xactimate claim estimating software?
A. There are times in my role that I may be reviewing an estimate. And so, if I want to understand a particular line item within that estimate and know all the things that might be associated with that line item, I would go into Xactimate, I would put that line item in, and then I would open up that line item to look at the various things that were associated with the work in that line item.
Q. Okay. When you say "line item," tell our jury what it is you're speaking of.
A. In Xactimate, when you're writing an estimate, each -- you write an estimate on a line-by-line basis using a category and a selector code to enter that line item.

Page 32

So, that's what I'm referring to.
Q. Okay. When you say "category," is it broken down into categories? What do you mean?
A. Xactimate is broken down into categories such as drywall, roofing, flooring. There's many categories within there. So, that's the category.
Q. And you also said something about a selection code. What's that?
A. The selector code is --
Q. Selector code. Sorry.
A. -- once you go into a category... So, if I go into drywall, once I enter drywall, then I would select the selection within drywall, such as half-inch drywall. So, the selector code would be one-half.
Q. Okay. So, is the selector code more quality-related or spec-related?
A. The selector code is based on that -- that a claim rep will be entering would be based on what was present in the loss. So, that's why I would go in and look at that; to see the description around that selector code and to see all the associated items that are included

Page 33

within that selector code.
Q. Okay. And then you can look through the Xactimate estimates and do a comparison if you need to?
A. If I have questions about what's included in an estimate, I can go into Xactimate and pull up a line item and get additional information as to what's included.
Q. Okay. Within the category... You mentioned drywall and roofing; so let's just take roofing for an example, that category.
What's included in the roofing category?
A. There are many items included in the roofing category.
Q. Such as?
A. The items that I'm most familiar with are roof shingles, composition shingles, and the various types of composition shingles, the various types of other type of roofing materials, roof vents, all the things that you would expect to see - or may see - on roofs.
So, those are the items that are typically included within the roofing category.
Q. Okay. And then, how would the selector code work, say, in the roofing category?

What would it show you with respect to that?
A. So, again, if I am an estimate writer and I go out to a home and there's damage to a roof - and let's just, in this example, say it's a three-tab roof, and the damage is covered.
So, the estimate writer is writing an estimate either for the repair or replacement. They would select RFG for roofing, and they would select the appropriate category code - oh, excuse me - the appropriate selector code that would bring in the three-tab product, either on a per-shingle price or a per-square price.
But that's what the -- that's -- there are many items within the selector codes. That's just an example of how, on a line-by-line basis, a claim representative would go through and estimate.
Q. Okay. Are there -- I mean, how do...
Once you get into the categories, like you said, shingles and the types, and other roofing, and vents, are those broken down by -- do they have codes themselves as well, individual codes, under the roofing category?
A. Vents, drip edge, and other items



like that do have individual selection codes within the roofing category.
Q. All right. Now, whenever you access an estimate in Xactimate, how do we know that you accessed that claim file?
A. Well, I'm not accessing the claim file when I'm looking in Xactimate.
Q. I'm sorry. How do we know you're accessing that estimate?
A. I don't know how that -- so, I'm not accessing the specific estimate; I'm accessing Xactimate and I'm pulling up that category and selector code that I may have a question about. But I'm not opening the actual estimate for that claim file.
Q. Okay. So, you don't ever access the actual estimate that's created by State Farm in Xactimate?
A. Well, I look at the estimate in the claim file that's been printed and made part of the claim file, and that's how I review estimates for a specific claim file if I'm reviewing an estimate.
If I have questions about that, then I access Xactimate. And I do not access that



specific claim -- that specific estimate, but I access Xactimate to look at the category and selector code. But my review of the estimate for that particular claim is through the documentation in the claim file.
Q. Okay. And as part of your job, do you do any routine reviews and any reports derived from those reviews?
A. I do, at times, review claim files. Those reviews do not have a report associated with those.
Q. Okay. Do you just -- if there's no report, what's the purpose of the review?
A. Again, I'm working with our section manager and perhaps our team manager, the team manager with that file. And so, I'm accessing the file and reviewing the file to provide guidance to them on that matter.
Q. Okay. After an estimate is already created?
A. There are many stages that may exist in an estimate. So, they may create an estimate, but it's in a draft form, and so that may be a part of the claim file at that point - in a draft form.



So, I may be reviewing the file with the estimate in a draft form. I may have questions. And if I do, then I would visit with the section manager or team manager about that. But...
Q. Does the -- does the insured receive a copy of the draft estimate that you review?
A. I don't know.
Q. Well, I mean, what are they supposed to receive? I mean, how does the training go?
A. Well, I don't know about the training on that. I can speak to -- I know that we provide our customer an estimate when we believe that it's -- it has the information it needs to make payment associated with a claim; that we provide our policyholders with the estimate at that time.
Q. Okay. As a claim consultant, have you gone in first and looked at an estimate in a claim file, had questions about it, then accessed the claim information in Xactimate, made recommendations, and then those recommendations have caused a change in the estimate?
A. I have, as a claim consultant, reviewed estimates, visited with the section manager, asked questions and asked them to

EXHIBIT 13

believe we've worked on a claim survey together in the past, and it was based on his request to complete a claim survey.
Q. Okay. Now -- so, Eric Daly would send you an email requesting your initiating a claim survey. And what happens next?
A. Well, I don't know if he sent me an email or it was a phone conversation or -- Eric Daly, at times, has been officed very close to me; so it could have been a conversation in the -- in the office.
But if there was a request to do the survey, then I would work with the individuals that help set up the survey, and we would work on the timing and logistics of completing a survey and finding participants to do it.
So, those are the -- kind of the typical steps of how a claim survey would go.
Q. And how do you go about identifying the people to be involved in the survey?
A. Every survey is going to be different. As I said, I --
Q. Let me try and narrow it down.
Have you done any surveys, or been a part of any surveys, on hail claims?



A. I have.
Q. Okay. Well, tell me how those went down, then.
A. Again, I believe I've probably been a part of many surveys - or a few surveys anyway - on hail claims.
Q. I believe you have.
A. So, it depends upon which division that we're looking at. It depends on the responsibilities that that division manager has, based on state or the segment of claims.
So, it's going to vary from survey to survey how we would go through and identify individuals that would be a part of the claim file review -- or claim survey review.
Q. Okay. And those surveys on hail claims, have you been on any of them that dealt with claims, in whole or in part, for Oklahoma?
A. It's been many years since I was involved in a claim survey that I may have been involved, in whole or part, in Oklahoma, but I do believe that I may have been involved in a survey for Oklahoma.
Q. Are roof claims still the biggest



drain on indemnity dollars?
A. Roof claims are our most frequent claims that we receive - wind and hail claims specifically, not roof claims, but most often roofs are what's damaged in wind and hail claims.
So, wind and hail claims is our most frequent claim.
Q. Well, my question was not so much as to frequency but related to severity. And severity is the average amount paid per claim, at least it used to be at State Farm.
Is that term still used?
A. It's my understanding that average severity is based on what's paid either on claims overall or within an individual peril, but it's the average amount paid on that claim --
Q. And are roof --
A. -- type of claim.
Q. Are roof claims still the biggest piece of the pie, so to speak, on indemnity dollars paid by State Farm?
MR. LEFFEL: Objection, form.
Go ahead.
A. Based on the knowledge that I have, it's our most frequent claim. And as our most



frequent claim, indemnification associated with roof claims and wind and hail claims is typically our highest category type, or peril, for indemnification.
Q. (By Mr. Marr) Have you ever been involved with discussions or notifications with P&C Claims about focusing on what can be done to lower State Farm's indemnity payments related to roofs?
A. I have not.
Q. Okay. You're not aware of those types of objectives?
A. In my time at State Farm - almost 32 years - I've never been asked -- or never heard anyone within State Farm state that they're trying to lower the indemnity associated with a claim.
Q. Okay. You -- as you understand it, I mean, you would agree, would you not, Mr. Moss, that any intentional attempt to lower indemnity payments would, in fact, constitute bad faith?
MR. LEFFEL: Objection, form.
You can go ahead.
A. What I can state is: In accordance with our policyholder, we are looking to pay what



EXHIBIT 13

But those are three states that -- that I can recall where I've given deposition -- depositions.
Q. Okay. And you said that that testimony, for the most part, was related to a particular subject?
A. That's correct.
Q. And what subject was that?
A. Estimatics and estimate writing.
Q. And specifically what?
A. Well, the topics have varied, but it's most often related to Xactimate and how we use Xactimate in completing estimates.
Q. Okay. And what were the contentions as to misuse?
A. Well, I don't know that there were contentions regarding misuse, but I know a few of those depositions have been very broad overall to ask about our use of Xactimate. Some of those depositions have been very narrowly focused, such as to a particular setting within Xactimate, such as labor efficiency. And others have been related to other settings within Xactimate --
Q. Overhead --
A. -- such as depreciation.



Q. Overhead and profit being among them?
A. To my knowledge, I haven't been specifically deposed regarding overhead and profit, but not to say that overhead and profit hasn't been a part of the discussion or a part of the deposition. But --
Q. Sure. I understand. It just wasn't the focal point?
A. It may have been asked. I don't know that it was asked, but it may have been asked in one of those depositions.
Q. Okay. What was the setting -- what was the question with regard to depreciation, the settings on depreciation within Xactimate?
A. It's been a while since that deposition was given, but, to the best of my recollection, it was related to how the Xactimate settings are that you can set up within the parameters of an estimate, how those settings are set up for State Farm around depreciation, and how State Farm -- what guidance State Farm has related to depreciation on building items.
Q. Okay. And are you -- is that something that, as a consultant, a claims



consultant, you're involved in; making recommendations to State Farm as to the settings within Xactimate on certain issues such as depreciation, labor efficiencies, O&P, things of that nature?
A. As a claim consultant, I work with my peers as we develop guidance around claim handling which would include Estimatics. And since building estimates -- the tool that State Farm uses to complete building estimates is Xactimate, I do have -- or in my past roles, I've had conversations with Xactimate and other business partners within State Farm, such as Enterprise Technology and others, to convey how we need settings within Xactimate to work so that they can help us comply with our commitment to our policyholders and the guidance and procedures that we have out there related to those topics that you just mentioned.
Q. Okay. So, when you say your "peers," are you speaking of the other nine claims consultants?
A. I am.
Q. So, are all those other nine claim consultants - ten counting yourself - are they



also involved in homeowners?
A. They are.
Q. Okay. And are there other claim consultants for different sectors?
A. Are you referring to a different part of the policy?
Q. Yeah. Yeah. Like auto, casualty, things like that. Do they have consultants for those just like they have consultants for homeowners?
A. There are consultants for fire casualty, so homeowners casualty claims. And there are consultants for auto claims.
Q. Okay. All right. But just ten consultants that are doing the same thing that you're doing; correct?
A. They're doing very similar things to what I do. We may have some varying responsibilities. But for property claims, there are ten of us that work within -- fire consultants that work within property claims.
Q. So, are you all - you ten - the ones responsible for making recommendations for the settings within Xactimate?
A. So, the ten of us - and that number

Page 78

has varied over the years --
Q. Sure.
A. -- work on the guidance without our Operation Guides working on policy-related matters. But there's typically one of the people in the ten - and for many years, that's been me - that would take that information and would be primarily responsible for working with other departments in State Farm that might be involved with Xactware and the way that we would use their tool, Xactimate, to complete building estimates.
So, it's typically one consultant that is primarily involved in that -- that part of the work.
Q. Okay.
A. You previously referenced Juan Guerrero, and that has been Juan Guerrero. And then me over -- during my time in this role.
Q. Okay. So, are you all also the ones who provide Xactware with the business rules of State Farm and set up the profile - the company, State Farm's profile - within Xactware?
A. So, it's my understanding that the Xactimate tool allows certain things to be set up within the profile, you know, the user profile.

Page 79

When I say the "user," I'm talking about whatever entity is using Xactimate; so the State Farm profile.
The way that I have interacted with them in my role on this is I have worked with other departments, such as Enterprise Technology, to set a -- based on the profile options that are within Xactimate, these are the parameters or the things that we need to select that will allow us to complete estimates that align with the guidance that we have in our Operation Guides and our -- that would also allow us to handle claims in alignment with our commitment to our policyholder and with the policy provisions that are within homeowners policies.
Q. Right.
You also, I believe - in speaking with Susan Hood - you align them with your business rules? Have you heard that before?
A. I have not heard the term "in alignment with business rules."
Q. Are you familiar with State Farm's business rules?
MR. LEFFEL: Objection, form and scope.

Page 80

A. I'm not familiar with that phrase within State Farm "business rules."
Q. (By Mr. Marr) What about "business practices"?
A. I've certainly heard "business practices," but -- but I don't -- I'm not familiar with that term being used in State Farm in the roles that I work in. So, I'm not familiar with that.
Q. Okay. Are you provided annual business goals, business targets from leadership?
MR. LEFFEL: Objection, form and scope.
A. In my role, what I receive is - and what I help work on - is a plan of how we want to address claims and handle claims with quality each year. So, that's what I receive and what I'm aware of that we're working toward. And so...
Q. (By Mr. Marr) Okay. Well, my question was: Do you receive annual business goals, business targets, or objectives from leadership?
MR. LEFFEL: Objection to form and scope. And, you know, Jeff, I'm trying to give

Page 81

you some leeway to find out who this witness is and what he does, but the Court Order is really limited to his role in responding to RFAs, and so that's my objection.
Q. (By Mr. Marr) Go ahead.
A. So, there are broad company goals out there that I as well as - I believe, to my knowledge - every associate at State Farm in claims would receive, such as our -- how we want to grow as far as the number of auto policies, how we want to grow as far as the number of fire policies. So, those are broad goals that are out there that are commonly communicated throughout claims, to all levels.
But as far as my specific work and -- you know, we have Quality Plans that we develop and work on to assist our claims partners that are the ones that actually handle the claims, our claim representatives, claim team managers, claim section managers. We develop Quality Plans to help them execute on handling claims in commitment with our -- in commitment to our policyholder.
Q. Okay. Who participates in preparing these Quality Plans? The ten of you?

Page 118

Q. (By Mr. Marr) What were they?
A. And I apologize, I'm trying to reflect. So, if it takes me a moment, I'm just reflecting back to see what those may have been.
Q. That's fine.
A. I haven't been on that team for about a year.
There was a recommendation around some of the common findings that we would see in files where maybe we had potentially over-scoped or under-scoped something on a roof. And so, one of the recommendations was to work with Xactimate to build a rule within Xactimate so if something -- if an estimate was being uploaded -- getting ready to be uploaded on a wind and hail claim and it had certain criteria met but other things weren't in the estimate, it would notify the estimate writer that, "Hey, do you need to include these items?"
It also -- that rule also said, if it met certain criteria, "Hey, you're including this other thing in the estimate and do you need to include it because it's already a part of another line item?"
So, that was one of the recommendations,

Page 119

again working with Xactimate again on creating a rule that, as the estimate writer was working on the estimate, it would give them a prompt. It didn't force them to change, but it would give them a prompt to say either, "Here's some items you may want to consider adding or some items that you've added that are already included in other items within your estimate."
Q. And who established that rule within Xactimate or XactAnalysis?
A. Well, Xactimate would have created the rule.
Q. Well, who requested the rule? Did the committee - or excuse me - the team?
A. Yeah. Our team worked with Enterprise Technology who connected with Xactware to create that rule.
Q. Okay. And who -- who did you work with at Xactware?
A. I don't know who they worked with at Xactware. I know I've been on calls with Xactware, but I don't recall the names.
Q. Who did you work with at Enterprise Technology at State Farm, then, who was the one who passed along the rule that needed to be

Page 120

established in XactAnalysis by Xactware?
A. So, we worked with Chris Bauer in Enterprise Technology as we communicated to him from the project team the parameters of the rule that we wanted to be put in place. And then Chris Bauer worked with Xactware.
Q. Okay. Did you all work with Chris Bauer? Was he kind of your contact person for everything Wind/Hail Fire Model Enhancement Team?
MR. LEFFEL: Objection, form and scope.
Go ahead.
A. He was not.
Q. (By Mr. Marr) Who was?
A. Well, he was our contact for Enterprise Technology on this request, and Chris Bauer is the one that I'm aware of at Enterprise Technology that works on Xactware requests.
But I -- and I want to make sure I understood your question, I do apologize. Do you mind repeating the question?
Q. No problem.
Was he -- every time you all had -- because

Page 121

you said you had other recommendations and this was the first one that you named.
Was your go-to person within Enterprise Technology always Chris Bauer or usually Chris Bauer?
A. If we had a recommendation -- and that's the only recommendation I recall that involved an enhancement to Xactimate.
But if we had any other recommendations that would involve a request to Xactimate, we would have worked with Chris Bauer.
Q. Okay. So, if I wanted to see any and all recommendations and materials relating to, and supporting, those recommendations of the Wind/Hail Fire Model Enhancement Team, where would those be?
MR. LEFFEL: Form and scope.
Go ahead.
A. Any recommendations that were implemented would have been communicated to our claim workforce through a guideline document. And so, that guideline document would -- would be out there and available on the State Farm intranet or would have been available at that time on the State Farm intranet.

Q. (By Mr. Marr) Did you all have a shorter name for that team that you all referred to it as? Surely you all didn't say, you know, this is the Wind/Hail Fire Model Enhancement Team every time, did you? I mean, I guess you could have. That seems like a long one to me.
A. Well, it is a long one, but that is how we referred to ourself.
Q. Okay. All right. Now, you said that, you know, the consultants, the -- I guess the Force 10 from Navarone group - my words, not yours - you all were involved in setting up the profiles, the user profiles for State Farm in the Xactimate - or excuse me - the Xactware claims tools; correct? Or at least had some role in it?
A. So, the ten claim consultants work on guidance and policy and procedures.
One of those claim consultants - and so I had been one of the two over the last -- well, my time period in Consulting Services - works primarily on Estimatics issues. So, that's myself and, before me, Juan Guerrero.
That consultant takes the lead in working with Enterprise Technology to -- as Enterprise Technology - Chris Bauer - works with Xactware.



So, if there are some things within Xactimate that we would need to have set available settings within Xactimate that tie back to the guidance within our Operation Guides, our policy that we have, I would work with Chris on those settings. And that's on the overall settings that -- that come to any individual user at State Farm using Xactimate.
Q. Okay. And those settings - and you correct me if I'm wrong - but those are settings, preferences, whatever you want to call them, that have to be decided with respect to pretty much every Xactware tool. Xactimate, XactContents, XactAnalysis, all of those require specific preferences or settings for that user. Correct?
MR. LEFFEL: Form and scope.
Go ahead.
A. It's my understanding that Xactimate and XactContents have profile settings that can be set by the user - so, in this case, State Farm - overall for our profile.
I don't believe XactAnalysis has that because XactAnalysis is a reporting tool that Xactware created that pulls in information from Xactimate or XactContents. So, I don't believe



XactAnalysis has those type of settings.
Q. (By Mr. Marr) Okay. Well, where are the personal -- the personal rules, though, are set up in XactAnalysis, are they not?
A. There is an option within XactAnalysis under reporting where a person that has access to XactAnalysis can choose from personal rules that are out there and made available by Xactimate.
Q. Okay. So, who at State Farm makes the decision -- I mean, you already estab- -- talked about the establishment of one rule.
Who makes the decision as to what other rules State Farm wishes to have Xactware check for them or include for them?
A. So, this may be a long answer, and so I apologize upfront.
Q. That's fine.
A. But it's not a -- it's not a simple answer.
Q. That's fine.
A. So, in there you referenced personal rules; so personal rules I want to talk about, and then I'll come back to the other part of the answer.



Q. Okay.
A. Personal rules is available in XactAnalysis. And there are certain personal rules that Xactware has created that any user that has access to XactAnalysis can use.
So, that would include State Farm team managers or section managers.
So, if they want to set a personal rule, they can. We haven't given any guidance from Consulting Services to our claims partners - the claim managers, claim section managers, team managers - telling them that they're required to set these personal rules. They have that option if they want to, but that is them working with their teams.
So, that's the personal rules.
There are other rules that don't apply like that does. Like, so, I can select a personal rule that if this personal rule -- if something happens and an estimate is uploaded, that personal rule is going to tell the person that set it that this has occurred, and you'll get an email that this has occurred in this estimate.
So, that's the way the personal rule would work if you set that.



EXHIBIT 13

The other rules are like the rule that I was speaking of earlier that we asked Xactware to add. And those are on an individual estimate and as the estimate is being created by an estimate writer. So, Xactware has many rules that they've established. And each carrier -- or each user, not carrier. But each user, at an overall level -- like for State Farm, Chris Bauer is who we work with on setting those. So, there's a selection of rules that -- that are available. And State Farm has worked through Chris Bauer to say, "These are the rules that we want to apply as estimates are written."

So, one of those might be, if I have a room and I set that room up that it's 10x10, but I estimate in there to replace 300 square foot of flooring. It would prompt up to the estimate writer that says, "Your room has 100 square feet on the floor, but you've estimated for 300 square feet of flooring. Do you want to do this?"

Q. Okay. I'm with you.

A. Those are the rules that I'm aware of. So, there's rules within individual estimates that can be created for the estimate writer that prompts them, you know, as they are



trying to finalize the estimate. So, if one of those rules are met, it will prompt them.

And then there are the personal rules that are available within XactAnalysis if a user with access to XactAnalysis chooses to use one of those personal rules.

Q. Right.

So, what are -- I mean, what are -- so, some are broader, some are more specific. Is that fair?

A. The rules that are created for -- within Xactimate for the individual estimate are very specific. If this thing happens, then it prompts the user as they're trying to complete the estimate, "Did you want this thing to happen?"

Q. Right.

A. That's very -- that's very generalized, but I'm trying to, you know, state it in words that make sense to me; right?

As an estimate writer, when I was writing estimates back in the 1900s, that's what would happen. If I were trying to complete that estimate and I had something in there that met one of those rules, it would say, "Do you want to



do this?"

Q. And they can make --

A. So, those are very specific.

Q. I'm sorry.

You can make those rules where they apply to all estimate writers. You can make it where it's, I guess, by person, by team, or anybody writing an estimate that might fit that criteria. Correct?

A. Those rules apply to every estimate that's written by State Farm.

Q. Okay. And the others?

A. The personal rules that Xactware has created and that are out there available in XactAnalysis, those rules, it's an option for anybody with access to XactAnalysis to set up one of those rules. And then, if an estimate is uploaded within -- that meets the reporting requirements that that user has set up -- that XactAnalysis set up, they will receive an email that says, "In this estimate, this personal rule was met." And it will provide them a link so they can go out and access XactAnalysis and look at that estimate.

Q. Okay. So, the first ones, the broad



ones that affect every estimate writer, what are those rules called?

A. I think they're just called rules within Xactimate. The claim user never -- the person writing the estimate doesn't see those unless it's --

Q. Right.

A. -- something that they're writing the estimate and it prompts them to that. So, an individual estimate writer doesn't know all the rules that are out there because those are something - a selection of rules - that Xactware has provided for each user like State Farm to select which rules that they may want to -- to have apply as an estimate writer is writing an estimate.

Q. Okay.

A. So, those are -- those apply to every estimate written within the State Farm profile. But they are very specific. Each rule is very specific.

And it's my understanding that, within Xactimate, they're just referred to as "rules."

Q. Who could tell me what all those rules are for State Farm that State Farm



EXHIBIT 13

Page 130

selected?
A. I believe Chris Bauer will be able to provide that information.
Q. Okay. And then, with regard to the others, the other rules that we spoke of, who could tell me what those rules are?
A. For personal rules, that's more challenging because, again, it's up to the individual user of XactAnalysis; do they want to set a personal rule.
Q. Right.
A. If they do, which personal rules do they want to set.
Q. Who all has the -- maybe the better way for me to ask it is: Who all has the authority to set up those rules?
A. Any user of XactAnalysis. So, for State Farm, anybody with access; which will be management level. We don't allow access to XactAnalysis for claim representatives.
Q. Okay.
A. So, any management-level employee would be able to set up -- out of the available options that Xactware has provided, they could set up a personal rule. They can only set it up

Page 131

for their hierarchy.
So, you know, if -- you know, like on this call, if we all reported to Jon, Jon could go in and he could select a personal rule from an available option, and then he could say he wants that to apply -- to apply to Tom and Cheryl and Kevin and the others that are on Jon's team. And so, if any one of us then wrote an estimate that met that rule and uploaded that estimate to Xactimate, then Jon would receive an email stating that that personal rule had been met on that estimate.
Q. Okay. Makes perfect sense.
Who has the ability to set up an Enterprise-wide rule?
MR. LEFFEL: Objection to form and scope.
Go ahead.
A. So, the Enterprise-wide rules that Xactimate -- so, again, Xactimate has options for these rules. And in the example I gave earlier, there was a rule that they did not have available that we felt would benefit our customers as our estimate writers were writing wind and hail roof claims estimates; so we went to Xactware and

Page 132

asked if they would consider adding that rule. So, we worked through Enterprise Technology to add that rule.
I do not know if Xactware made that available to everyone that uses Xactimate or if they just made that available for State Farm.
Q. (By Mr. Marr) Right.
A. But for those rules that apply on State Farm estimates, over my time in this role - in the 15 years - it's been either myself or Juan Guerrero that worked with Enterprise Technology to say that we want these rules to apply to estimates that are being written in the State Farm profile.
Q. Okay. Are those -- is that called like a rules request, or does it have a particular name, or is it not that formal?
A. I've always just referred to it as "Xactimate rules" in my conversations and meetings with Chris Bauer. So, I believe they're just referred to as "Xactimate rules."
Q. Okay. Is Juan still with the company?
A. He's not.
Q. Did you hear me?

Page 133

A. I'm sorry. Did you get my answer?
THE REPORTER: I did.
Q. (By Mr. Marr) No, sir.
A. He retired in 2018.
Q. That's what I thought. Good for him.
All right. I've also learned that, in addition to the rule on - or I guess we'll call it the claim procedure that was enacted with Nicole on hail, there was also a similar claim procedure that was developed just for wind. Is that correct?
MR. LEFFEL: Form and scope.
You can go ahead.
A. So, for hail, the procedure was: If the weather report showed that the hail size was 1 inch or less, that we wanted management to review those files and the claim representative to bring it to them before the final decision was made.
The same applied to wind; if the wind speeds on the report indicated that the winds may have been 50 miles an hour or less.
Q. (By Mr. Marr) Okay. And that was -- so, that was -- were they separate or

**EXHIBIT 13**

# EXHIBIT 14

IN THE DISTRICT COURT OF OKLAHOMA COUNTY

STATE OF OKLAHOMA

GARY HOSIER and
TRACY HOSIER,

Plaintiffs,

VS.

Case Number
CJ-2021-1741

STATE FARM FIRE AND CASUALTY
COMPANY and DAVID HOFFINES,

Defendant.

CERTIFIED COPY

* * * * *

VIDEO DEPOSITION OF KELLY WIENSTROER
TAKEN ON BEHALF OF THE PLAINTIFFS
IN OKLAHOMA CITY, OKLAHOMA
ON APRIL 26, 2023
COMMENCING AT 9:46 A.M.

* * * * *

INSTASCRIPT, LLC
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA 73102
405.605.6880
schedule@instascript.net

Reported by: Cheryl D. Rylant, CSR, RPR

EXHIBIT 14

Page 70

I saw no, I guess, criticisms of your performance, for what it's worth.
A. That's my recollection --
Q. Okay.
A. -- as well.
Q. So, do what you want, but I might take it with a grain of salt and consider the source.
MR. MARR: No, that wasn't a question. That was just a statement, based on my observation.
Q. (By Mr. Marr) But the situation that Ms. Draper put you in, you were qualified to deny totaling roofs; correct? You could -- it was okay, you could deny that the roof was totaled and you didn't need her approval; correct?
A. That is correct.
Q. But, conversely, you were not qualified to total a roof without obtaining her blessing to do so; correct?
A. That would be correct.
Q. Okay. Now, I'm going to give you what was marked to Ms. Draper's deposition as Exhibit 19, which is your personnel file.

Page 71

(Draper Exhibit 19, previously marked.)
Q. (By Mr. Marr) And we'll try not to make too big of shambles of it. I'm just going to focus on the period of time today --
A. [Indicating.]
Q. Yeah, you can go ahead and take the rubber band off.
-- the period of time today that Ms. Draper was involved, and that'll be the years of 2019, '20, and '21 to a lesser degree.
And down here at the bottom right-hand corner, you know, we have Bates numbers.
A. Uh-huh.
Q. Lawyers love their Bates numbers.
And I think 19 starts with Bates 4692. So, if you'll look at the bottom right-hand corner for 4692, that's the 2019 performance review, and I'd like to direct your attention to there. And let me know when -- when you find it.
A. Okay. I'm there.
Q. Okay. And, you know, if -- do you see... Which would you rather use? These have individual page numbers within. You'll see it goes to page 16 and has, you know, 2 of 16, 3 of 16, and it has the Bates numbers.

Page 72

Which is easier for you to use?
A. Either is fine.
Q. Okay. Well, let's go to page 6 of 16 within this 2019 review. And you had a manager named Steve Imhoff, I-M-H-O-F-F; correct?
A. Yes.
Q. And you'll see down there the first bullet toward the bottom under Mr. Imhoff's comments that says, you know:
"Kelly does an outstanding job on Request Reviews. Her authority requests in Request Reviews are detailed and accurate. Management file reviews indicate Kelly's files are well documented as to her actions. Kelly had two reinspection worksheets in February. They have been shared with her as a development as she learns her new role."
Did I read that correctly?
A. Yes.
Q. Okay. So, that's just kind of evidence to me that, you know, I don't -- I don't see anything there indicating that you were in wilful need of up-skilling, do you?
A. I -- I do not --

Page 73

Q. Okay.
A. -- see any.
Q. And that's consistent with -- with those that you reported to before Ms. Draper's Second Coming to State Farm?
A. Yes. I do not recall any coaching or specific...
Q. Okay. If we go to the next page, 7 of 16 of the document, kind of down there in the same area, the second bullet:
"Kelly is a detailed and proficient Claim Specialist."
Do you see that?
A. Yes, sir.
MR. LEFFEL: Sorry to interrupt, but I was, like, trying to ask somebody to bring me her personnel file and the phone picked it up and it was, like, speak-texting your entire question into my text messages.
MR. MARR: All right. I actually had that happen the other day and I was surprised how well it worked.
MR. LEFFEL: Yeah. It -- it kind of almost has it verbatim; right?
MR. MARR: It makes you a little

**EXHIBIT 14**